1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENNETH FAULKNER,<br><br>                    **Plaintiff,**<br><br>          v.<br><br>COUNTY OF KERN, et al.,<br><br>                    **Defendants.** | 1:04-CV-05964 OWW TAG<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOCS. 42, 60 & 65), MOTION TO REINSTATE (DOC. 38), AND MOTION TO BIFURCATE (DOCS. 55 & 58)** |

## I.   INTRODUCTION

This is a civil rights case brought pursuant to 42 U.S.C. § 1983.  In 2000, Plaintiff was convicted in Kern County Superior Court of attempted kidnaping and false arrest.  He was sentenced to two life terms.  After serving three and one-half years of his sentence, his conviction was vacated on habeas corpus on the ground that several pivotal child witnesses recanted their trial testimony.  He now seeks civil damages from the County of Kern and various individual County and State officials involved with his arrest, prosecution, appeal, and habeas petition.

Before the court for decision are cross-motions for summary judgment concerning all claims.  (Docs. 42, 60 & 65.)  Also currently pending is a motion to reinstate dismissed defendant Deputy Public Defender Leslie Greer (Doc. 38), as well as a motion to bifurcate the trial (Docs. 55 & 58).

**1**

## II. **BACKGROUND**

### A.    **The Incident and Initial Investigation**.

On November 25, 1999, Carol Cooper called the Kern County 911 dispatcher to report that Plaintiff grabbed a child named Samantha and placed her on the handlebars of his bicycle. (County's Ex. I, 911 call transcript; Fennel Decl. at ¶ 4; Dixon Decl. at ¶4-6.)  Kern County Sheriff's Deputies Fennel and Dixon were dispatched to investigate the complaint.  When they arrived on the scene, the parents and several other adults restated the complaint made to the 911 operator.  Each of the adults confirmed that Plaintiff grabbed Samantha and placed her on his bicycle. The parents also told the Deputies that Plaintiff grabbed Brandon and pulled him.

Deputy Fennel's essentially undisputed description of his involvement details the information gathered during the investigation:

> On November 25, 1999, I was on patrol in metropolitan Bakersfield. I was dispatched to a call in which it was reported that a suspicious man was annoying children in an apartment complex at 811 Beardsley Avenue, apartment #14. When I arrived, I spoke to Carole Perry who told me that she was the mother of eight-year-old Breanna Blankenship. Perry reported also that eight-year-old Samantha Spoon was Breanna's half-sibling and that she was visiting Perry's home.
>
> Perry told me that Breanna and Samantha reported to her that a man on a bicycle offered the girls money to go with him and grabbed Samantha in an attempt to force her to go with him. Perry said that a little boy, Brandon McElroy, had also been grabbed by the man. Perry said that both girls appeared to [be] frightened and that they thought that man was still in the apartment complex.

//

//

**2**

Perry said that she and her father, Richard Bond, went
out to the parking lot and saw a man [on] a bicycle
traveling north on Beardsley Avenue. Perry and Bond
followed the man to a residence at Plymouth Avenue.
Perry said that she approached the man and asked him
what he was doing at the apartment complex. The man
replied that he was there to pick up a girl but
couldn't locate her.

After Perry explained to me what Samantha and Breanna
had told her, I spoke to Samantha, Breanna and Tiffany
Grady. When I spoke to the girls, I did not suggest to
them that anything happened. Instead, I asked each
child to tell me if something happened. I did not use
leading or suggestive questioning and I did not coerce
or pressure the girls to tell a particular version of
the events. Instead, each girl told me her account of
what happened. I recorded what the girls told me in the
incident report I prepared. The girls' demeanor
appeared frightened. Breanna had difficulty talking
about the incident. However, I did not force her to
speak but allowed her to take her time in telling what
happened. I did not find this to be unusual but,
instead, consistent with the fear that her demeanor
indicated to me she felt.  The girls' statements were
each substantially similar to the others. Also, Deputy
Dixon interviewed another child, Brandon McElroy, who
also described the incident markedly similarly to the
girls. I did not speak with Brandon McElroy.

(Fennel Decl. at ¶¶4-5.)

Deputy Dixon spoke with Brandon McElroy and his mother Edie
Kincaid.  Dixon's account of his involvement in the investigation
is undisputed as well:

Upon my arrival, I contacted BRANDON DEAN MC ELROY.  MC
ELROY told me he was playing in the driveway area of
his apartment with a lot of other children.  MC ELROY
saw the suspect, who was later identified as Kenneth
Faulkner, riding a bicycle through the apartment
complex toward Beardsley Avenue.  Faulkner stopped next
to MC ELROY leaning over on his bicycle and grabbed MC
ELROY by the left hand and wrist area.  Faulkner told
MC ELROY"Come with me."  MC ELROY attempted to pull his
hand away from Faulkner and then began screamming.
Faulkner let go of MC ELROY when he started screaming
and then rode away on his bicycle.

I asked MC ELROY if Faulkner attempted to place him on
his bicycle, pick him up, or pull him away.  MC ELROY
told me Faulkner just pulled on his arm.  I asked MC
ELROY to demonstrate for me how Faulkner pulled him.

**3**

> MC ELROY placed both of his hands on my left hand and
> pulled me a distance of approximately one-and-a-half-
> to-two feet.  I asked MC ELROY if he was sure this was
> how far Faulkner pulled him.  MC ELROY said he was.
> MC ELROY described Faulkner as a white male wearing a
> blue hat, blue shirt, glasses, having brown hair with a
> long ponytail, and blue eyes.  MC ELROY also said
> Faulkner was riding an older blue bicycle with hand
> brakes on top of the handlebars.  This concluded my
> interview with MC ELROY.

(County's Ex. H, Incident Report prepared by Dixon at 3-4.)

Dixon denied using coercion or pressure when interviewing

Brandon:

> When I spoke to [Brandon], I did not suggest to him
> that anything happened or what had happened. I asked
> him to tell me if something happened. I did not use
> leading or suggestive questioning and I did not coerce
> or pressure the boy to tell a particular version of the
> events. Despite his age (five-years-old) Brandon told
> me what happened. I recorded what he told me in an
> "additional narrative" report I prepared.

(Dixon Decl., at ¶7.)

Deputies Fennel and Dixon then placed Plaintiff under

arrest.  Fennel explained to Plaintiff that he was being arrested

on three counts of kidnaping a child for the purpose of sexual

assault.  But, before Plaintiff was told of the factual

allegations against him, he asked the deputy whether the children

said he grabbed them and then denied guilt by explaining that it

couldn't be a sex crime because he "had no sexual gratifation

[sic]."  (County's Ex. E, Incident Report; Fennel Decl. at ¶6.)

After the arrest, Deputy Dixon had no further involvement in

Faulkner's case.  (Dixon Decl. at ¶9.)

Plaintiff had two prior California convictions involving

forcing females to go with him against their will for the purpose

of sexual assault.  In one of those incidents, he forced a minor

female to walk to an alley while he was on his bicycle.

(Brownlee Decl. at ¶9.)

**4**

**B.   The Criminal Proceedings**.

The initial criminal complaint against Faulkner was filed and the arraignment handled by a Deputy District Attorney who is not named in the complaint. (*See* Brownlee Decl. at ¶9; County's Ex. A-C.)   In December 1999, after the filing of the complaint and the arraignment, and one week before the scheduled preliminary hearing, Deputy District Attorney John Brownlee was assigned to the case. (Brownlee Decl. at ¶ 3.)  Brownlee had no contact with either Deputy Fennell or Deputy Dixon, nor with any of the child witnesses until the morning of the preliminary hearing.  (See *Id*. at ¶4.)  Just before the initial December 14, 1999 preliminary hearing date, Brownlee spoke to Samantha Spoon in the presence of Deputy Fennel. (*Id*. at ¶4.)  Brownlee declares that he conducted this interview because he thought she might have to testify at the hearing and Brownlee wanted to know the substance of her testimony. (*Id*. at ¶¶ 4-5.)  After this meeting with Samantha, Deputy Fennel had no further contact with any of the witnesses in the case. (Fennel Decl. at ¶8.)

The preliminary hearing did not go forward on December 14, 1999 and was continued until January 2000.  Brownlee had no further involvement with the case until the day of the continued preliminary hearing.  On that day, Brownlee asked Brandon to be present at the courthouse because Brownlee thought he would require Brandon's testimony.  Brownlee greeted Brandon in the hallway, but did not speak to him about the substance of the case.  Neither Brandon nor any other child witness was required to testify at the preliminary hearing. (Brownlee Decl. at ¶6.)  At the conclusion of the hearing, the court found that there was

**5**

probable cause to bind Fulkner over for trial.  (See *id*.)

Faulkner's trial was scheduled for May 2000.  (*Id*. at ¶7.)
A few days before the trial, Brownlee met with each of the child
witnesses to prepare his presentation of the evidence.  (Brownlee
Depo. at 39 (discussing having meetings with the child witnesses
before the trial and then dismissing certain charges based on
those interviews "just before trial").)

When Brownlee met with Tiffany, Tiffany confirmed most
aspects of her initial story, but did not confirm that Faulkner
grabbed her.  At the conclusion of this interview, Brownlee
immediately called Faulkner's defense counsel, Leslie Greer,
informed her of the content of Tiffany's interview, and dropped
the charges against Faulkner pertaining to Tiffany.  (*See*
Brownlee Depo. at 40.)

## C.   Mary Blankenship's Interactions with the District Attorney's Office.

Mary Blankenship, who is the grandmother of both Samantha
and Brianna, testified that she accompanied the girls to meetings
with Brownlee in Brownlee's office on two or three occasions.
Ms. Blankenship asserted during an evidentiary hearing in the
habeas corpus proceeding that Samantha had a history of lying
regarding family matters.  At some point in the late 1990s,
Samantha was removed from the custody of her parents because
Samantha had reported to the Department of Children's services
that she was being abused at home.  Samantha was ultimately
returned to her parents.  Ms. Blankenship asserted at the habeas
hearing that Samantha was returned to her parents in part because
her accusation of abuse turned out to be a lie.  (Pltf's Ex. A,

**6**

habeas evidentiary hearing Tr., at 20.)

At some point, Ms. Blankenship formed the opinion that Samantha was also lying about her interactions with Plaintiff. (*See id.* at 27.)  Although the record is not perfectly clear on the timing of Ms. Blankenship's communication of this belief to Defendant Brownlee, she did assert generally that she informed Brownlee of her "doubts" <u>before</u> trial.  (*Id.* at 43.)

> **Q:**   Ms. Blankenship, Mr. Marshall just asked you if you delayed a year before you told anyone of your doubts.  Isn't it correct that you told Mr. Brownlee even before trial?
>
> **A:**   Yes, I did. I'm Sorry.

(*Id.* at 43.)

In addition, Ms. Blankenship testified that, <u>after</u> the trial, she thought the girls were probably lying and then called Brownlee to tell him as much.

> **The Court:** ...The question is, after the trial, what did you do because you thought the girls were probably lying, and the first thing you did is you called Brownlee?
>
> **The Witness:**   Correct.
>
> ***
>
> **Q:**   When did you do that?  When did you call Mr. Brownlee in relation to the trial?
>
> **A:**   I talked to Mr. Brownlee after the trial about it also.
>
> **Q:**   How long after the trial is what I am getting at. Do you know?
>
> **A:**   When I had called Mr. Brownlee's office to find out about the sentencing, and that's when I had told him what took place.

(*Id.* at 33.)  But, nothing in the record clarifies when after the trial this communication took place.

Ms. Blankenship also testified that she expressed similar doubts to a "lady from the District Attorney's Office," in September 2000, and ultimately to James Faulkner "in September, shortly after trial." (*Id*. at 44.)

> **Q:** And isn't it also correct that you testified on direct that you ultimately told attorney Jim Faulkner, James Faulkner, in September 2000, shortly after trial.
>
> **A:** Yes.
>
> **Q:** And you also testified -- well, did you in fact talk, yourself, with the D.A. investigator in September of 2000?
>
> **A:** I talked with her -- with a lady from the District Attorney's Office.
>
> **Q:** Did you express that same doubt to her?
>
> **A:** I did.

(*Id.*)

Brownlee maintains that he could hardly recall meeting Mary Blankenship and denied ever receiving any warnings from her regarding the veracity of any of the child witnesses. (*See* Brownlee Depo. at 49-51, 57-61; *see also* Brownlee Decl. at ¶7.) When asked, hypothetically, what Brownlee would have done if he had received information prior to trial indicating that Samantha was not credible, Brownlee responded that he would have informed Plaintiff's defense counsel, Leslie Greer, because he thought "she would be entitled to that." (*Id*. at 59.)

Ms. Blankenship further asserts that, when Brownlee interviewed Samantha, he suggested some answers to her. The record does not reflect, however, the substance (i.e., the materiality) of any answers she might have given. The pertinent portion of Me. Blankenship's testimony is:

**8**

**Q:** Do you recall Mr. Brownlee ever suggesting to Samantha answers?

**A:** Yes, I do.

**Q:** Did you ever hear him suggest to Samantha that something actually happened in a different way from what she had said?

**A:** Yes, I did.

**Q:** And then did Samantha then agree with Mr. Brownlee's version

**Mr. Marshall:** I am going to object to both Mr. Brownlee's suggestion and Samantha's responses as being hearsay.

**The Court:** The objection is sustained.

(Plaintiff's Exhibit A, Doc. 69, at 27).

Brownlee denies having suggested any answers to the witnesses or fabricating evidence in any way.  (Brownlee Decl., at ¶7.)

### D.   Conviction and Sentencing.

On May 9, 2000, a jury convicted Faulkner of false imprisonment and attempted kidnaping of Brandon, but acquitted him of the remaining charges.

On June 6, 2000, Faulkner was sentenced.  (Kern's Statement of Undisputed Fact ("KSUF") #47; Brownlee Decl., at ¶7.) Faulkner's public defender, Leslie Greer, filed a notice of appeal on June 13, 2000.  (Docket from *People v. Faulkner*, Fifth Appellate District, Case No. F035831.)  Louis Wijsan was appointed as appellate counsel for Faulkner on August 7, 2000. (*Id.*)

//

//

//

**9**

**E.   <u>Brownlee Learns Witnesses May be Recanting</u>.**

In September 2000, Brownlee learned that one or more of the girls might be recanting her trial testimony. (KSUF 48; Brownlee Decl. at ¶14.) At that point, Brownlee did not know the extent of the girls' intent to recant. Brownlee directed Patricia Poeschel, an investigator with the District Attorney's office, to interview the children. (KSUF 49; Brownlee Decl. at ¶14.) The interviews began in September but were not concluded until November 2000. (Ex. L to Poechel Depo. at 2-4).

**F.   <u>Wijsen Files Opening Appellate Brief</u>.**

Around the same time Poeschel began interviewing the child witnesses, in September 2000, Wijsen filed his opening appellate brief, making no mention of any potential recantations. (State's Ex. A.)

**G.   <u>Appellate Counsel Becomes Independently Aware of the Recantations</u>.**

Meanwhile, in September 2000, at essentially the same time Brownlee begame aware of the potential recantations, Faulkner's uncle, James Faulkner, who is a lawyer, learned independently that the girls were recanting their trial testimony. (James Faulkner Depo. at 56.) James Faulkner passed this information on to Wijsen. Although the record is not entirely clear on the timing of this communication, Wijsen probably became aware of the recantations in September 2000 as well, as is evidenced by representations made by Wijsen in a subsequent court filing. (*See* State's Ex. B, at 3 ("In September of 2000, appellate counsel for petitioner received information alleging that Mary Blankenship...had contacted the kern County District Attorney's

**10**

staff and advised it that her [grand]children had lied about what had occurred between them and petitioner.").)

Wijsen and James Faulkner would eventually dispatch a private investigator to take the witnesses' statements, but this process would not be completed until February 2001.

### H.   **Marshall is Assigned to Handle the Appeal for the State**.

Assistant Attorney General R. Todd Marshall first became involved in the case on September 26, 2000, shortly after Wijsen filed his initial appellate brief.  (Marshall Decl. at ¶4.) Marshall filed a response to on behalf of the People on October 26, 2000.  At that time, Marshall had no knowledge of the potential recantations.  (Marshall Decl. at ¶5.)

### I.   **Brownlee Receives the Poeschel Reports**.

Poeschel concluded her interviews of the child witnesses in November 2000.  Of the four child witnesses who testified at the criminal trial, Brianna and Samantha reported that they lied about Faulkner grabbing Samantha.  Poeschel prepared reports on the interviews and provided these reports to Brownlee on or around November 21, 2001.  (These reports are referenced hereinafter as the "Poeschel reports.")

While reviewing the case file and the Poeschel reports, Brownlee noticed that, at about the same time the children began to recant, Faulkner had been sending letters to the families of some of the children, offering them money to get them to "tell the truth."  (*See* Pltf's Exh. E & F, Letters from Brownlee to Greer and Marshall.)

**J.   Brownlee Produces the Poeschel Reports to Greer**.

On November 21, 2001, within one day of receiving the reports from Poechel, Brownlee provided copies to Leslie Greer. (KSUF 52; Brownlee Decl. 14; Pltf's Ex. E.)   At the time, Brownlee did not know the status of Faulkner's appeal and believed Greer would act on the information.   (Brownlee Depo. at 74.)   Brownlee attached the reports to a letter which states in its entirety:

                                        November 21, 2000

        RE: People v. Faulkner

        Dear Leslie,

            Enclosed please find a number of reports from our
        investigations unit, as well as multiple letters from
        Faulkner to the parents of the victims.

            It appears that the girls are recanting their
        story.  However, it also appears that Brandon is
        sticking to his story.  You might recall that the jury
        convicted on Brandon, acquitted on the girls.

            While reading through the information, I noted
        that about the time Faulkner starts offering money to
        the family of the victim's [sic] is about the time the
        girls recanted their story.  Interesting.

            Let me know if you would like to do anything about
        this.

                                John R. Brownlee
                                Deputy District Attorney
                                Special Prosecutions Unit

**K.   Greer's Assertion that She Provided the Poeschel Reports to Wijsen**.

Greer claims that she promptly passed the reports on to Wijsen, Faulkner's appellate counsel, after speaking with Wijsen on the telephone about the matter.  (Greer Decl. at ¶6.) Plaintiff asserts that the Reports were never passed along to

**12**

1  Wijsen.[1]

2      **L.    Production of the Smith Reports**.

3          An investigator hired by James Faulkner obtained the

4  children's statements in February 2001. (James Faulkner Depo. at

5  58-59.)  The investigator, Carl Smith, summarized his interviews

6  in a report. (Ex. E to James Faulkner Depo.)  According to

7  Smith's summaries, the girls stated that they decided among

8  themselves that they should lie and at no time claimed that

9  anyone coerced them into lying. (*See id.*)  Smith also noted in

10 his summary report that an investigator from the District

11 Attorney's office had also been conducting post-trial interviews

12 of the children and that Samantha and Breanna told the

13 investigator they had lied. (*Id.*; *see also* James Faulkner Depo.

14 at 70.)

15         Smith's interviews of the child witnesses were recorded and

16 eventually transcribed, although not until June 2001. (*See*

17 State's Ex. B.)  James Faulkner gave Wijsen the transcripts in

18 June 2001, but could not recall whether he gave Wijsen a copy of

19 Smith's summary report prepared in February 2001.

20     **M.    Wijsen Files the First Habeas Petition**.

21         On June 21 2001, while the appeal was pending, Wijsen filed

22 a petition for a Writ of Habeas Corpus with the Fifth Appellate

23 District. (State's Ex. B.)  The petition makes no reference to

24 the Poeschel reports, but did rely upon Smith Reports to argue

25

26 ───────────────

27     [1]    Wijsen passed away at some point in 2004 or 2005 (the
   record is unclear as to the exact date).  No deposition of Wijsen
   was taken nor are any declarations from Wijsen regarding this
28 case on record.

**13**

that the child witnesses had recanted.   In this habeas petition,
Wijsen acknowledged being aware of the recantations as of
September 2000 and specifically that he was aware that Mary
Blankenship "had contacted the Kern County District Attorney's
staff and advised it that her children had lied at trial...."
(*Id.* at 3.)[2]

**N.   The Order to Show Cause.**

On October 10, 2001, the Fifth District Court of Appeals
issued an order to show cause to the Kern County Superior Court
why Faulkner's initial habeas petition should not be granted.
The Superior Court set an evidentiary hearing for June 17 and
18th, 2002.

**O.   Marshall Receives the Poeschel Reports and Attaches
them to a Court Filing.**

On December 4, 2001, Marshall received a copy of the
Poeschel Reports from Brownlee.   Marshall assumed that Faulkner's
counsel also had a copy, in light of the allegations of
recantation contained within the initial habeas petition.
(Marshall Decl., at ¶9.)   Nothing in the record explains why
Marshall did not received a copy of the Poeschel reports until
December 2001, more than a year after they were produced.

On December 14, 2001, Wijsen filed a motion for bail pending
appeal on behalf of Faulkner.   Marshall filed an opposition to
release on bail, in which he directed the state court's attention
to the Poeschel Reports, but argued that the recantations should

_____

[2]   Plaintiff asserts that Wijsen's failure to mention the
Poeschel reports in this initial habeas petition is evidence that
he never received them.

**14**

be viewed with caution because they coincided with letters sent by Plaintiff to the parents of at least one of the child witnesses.  (*See* State's Ex. E, Opp'n to Bail Mot., at 2.) Marshall attached to his opposition copies of the Poeschel reports a letter sent by Plaintiff to Brandon's mother.  Again, Marshall assumed at the time that Wijsen was already in possession of the Poeshel reports.[3]  (Marshall Decl. at ¶5.)

### P.   <u>Marhsall Defends the Conviction at the Habeas Evidentiary Hearing</u>.

Marshall represented the State at the June 17 and 18, 2002 hearing on Plaintiff's initial habeas petition.  According to the Fifth Appellate District's description of this hearing "Brandon was the only witness who testified consistently at both the trial and the evidentiary hearings."  (State's Ex. E at 5.)  The Superior Court denied the writ, finding that Faulkner did not meet his burden of proof; that Brandon's testimony was consistent; and that, while Breanna and Samantha both admitted lying at trial, they both consistently stated that Faulkner offered them $20 to accompany him.  Finally, the Superior Court found that Faulkner's post arrest statement that he had "no sexual gratification" was compelling evidence of guilt.

---

[3]    In the first footnote to Plaintiff's motion for summary judgment Plaintiff points out that the Poeschel reports appear to have been hastily attached to the bail opposition.  This, Plaintiff suggests, "raises the question of whether Investigator Poeschel's reports were perhaps inadvertently disclosed to petitioner."  This assertion is baseless.  Marshall referenced the reports in the body of his motion several times.  (*See* State's Ex. D at 2.)

**Q.   <u>The Second Habeas Petition</u>.**

On September 25, 2003, the Fifth Appellate District granted Wijsen permission to file a second habeas petition. (*See* Pltf's Ex. M at 7.)  In the second petition, filed October 18, 2002, Wijsen alleged, among other things, misconduct with respect to disclosure of the Poeschel reports.  Specifically, Wijsen alleged that he first became aware of the Poeschel reports when they were attached by Marshall to the State's opposition to Plaintiff's bail motion.  (*Id.* at 28.)

> Unaware that the District Attorney's investigator had already uncovered the fact that the principal witnesses against petitioner committed perjury at trial, Private Investigator Carl Smith interviewed the witnesses and found that they had falsely accused petitioner and perjured themselves at trial.

> If petitioner had known that the commission of perjury was already known to the People, he would have so advised the Court in this Petition [] or the related motions.  As it was, he could rely only on his own discovery of what to the Court and petitioner himself was newly discovered evidence, which unequivocally established that the prosecution's key witnesses had committed perjury.

> While the Attorney General persisted in intensive efforts at persuading this Court that it must not issue an Order to Show Cause and that the Petition for Writ must be denied because petitioner's claims would be untrustworthy, neither the Attorney General nor the District Attorney disclosed to the Court or petitioner's counsel that exculpatory evidence in the People's possession showed the trustworthiness of the claims.  Even after this Court issued the Order to Show Cause, respondent kept this Court and the Superior Court and petitioner in the dark about the fact that the key witnesses had recanted to the People long before what respondent called their "purported recantations" to Investigator Smith.

> Not until respondent filed an Opposition to petitioner's motion for Release on Bail with the Superior Court on or about December 21, 2001, to which it attached the reports by Investigator Poeshel (Appendix ), did petitioner learn from this perhaps inadvertent inclusion of the existence of the exculpatory evidence, which supported his claims on appeal and on habeas corpus.

(*Id.* at 28-30.)  Wijsen argued that these circumstances constituted a Brady violation representing an "additional independent ground to mandate reversal of petitioner's convictions."  (*Id.* at 31.)

This second petition was successful.  The Fifth Appellate District essentially reasoned that Brandon's testimony, although credible, contained no proof of the intent element.  Because the only proof of intent came from the girls' recanted testimony, the conviction could not stand.  (*See* State's Ex. E.)

### R.   Recent Procedural History.

Plaintiff filed this lawsuit on July 14, 2004, seeking civil damages from the County of Kern, the State of California, and various individual defendants.  (Doc. 1.)  A hearing on the pending motions for summary judgment, for reinstatement of dismissed Defendant Greer, and to bifurcate was held on March 13, 2006.  (Doc. 96.)  At the hearing, Plaintiff was invited to submit a supplemental filing containing references to the record. Plaintiff filed his supplemental brief on March 21, 2006 (Doc. 97), to which the County replied (Doc. 98, filed March 22, 2006). Thereafter, the matter was submitted for decision.

### III.   SUMMARY OF THE COMPLAINT

The operative First Amended Complaint contains a laundry list of constitutional deprivations allegedly suffered by Plaintiff at the hands of Defendants.  For example, Plaintiff's first claim, which is directed at the Kern County Sheriff's Department, the District Attorney's office, the Public Defender's

office, and a number of individual employees of those offices,

alleges:[4]

> ...acting in their official capacities and with
> deliberate indifference, gross negligence and/or
> reckless disregard to the safety security and
> constitutional and statutory rights of plaintiff,
> maintained, enforced, tolerated, permitted, acquiesced
> in, and/or applied inter alia policies and practices
> including detaining and arresting without reasonable
> suspicion or probable cause; encouraging and partaking
> in perjury and falsification of statements and
> testimony causing false imprisonment and malicious
> prosecution; selecting, retaining, training and
> assigning employees with demonstrable propensities for
> misconduct including false arrest and subornation of
> perjury; failing to adequately train, supervise and
> control employees in the proper arrest, investigation
> of, and prosecution of suspects; failing to adequately
> discipline employees involved in the misconduct
> described [] including condoning and encouraging
> employees in the belief that they can violate the
> rights of persons such as the plaintiff in this action
> with impunity, and that such conduct will not adversely
> affect their opportunities for promotion and other
> employment benefits; failing to adequately investigate
> incidents such as the events complained of herein and
> conducting investigations in such a manner as to
> conceal the misconduct of employees, condoning and
> encouraging the fabrication of evidence following
> incidents involving the improper arrests and
> investigations.

(Doc. 12, filed Nov. 10, 2004, at ¶18.)  Plaintiff alleges that

the above-described conduct violated Plaintiff's "Fourth, Fifth,

and Fourteenth Amendment rights."

Plaintiff's own description of the case in his motion for

summary judgment hardly clarifies his allegations:

//

//

---

[4]    The named employees of the Public Defender's Office,
Leslie Greer and Mark Arnold, were voluntarily dismissed on April
20, 2005.  Plaintiff has now moved to reinstate Ms. Greer as a
defendant.

**18**

1
2
3
4
5
6
7

> Plaintiff alleges his arrest, wrongful conviction, and subsequent malicious prosecution were obtained through the intentional efforts of all named defendants to prosecute plaintiff's wrongful conviction through the use of false statements and perjured testimony of minor children witness/victims who were being manipulated and directed and encouraged by defendants.  Plaintiff further alleges that his conviction was upheld as a result of the defendants wrongful acts in violation of plaintiff's constitutional rights in suppressing the perjured testimony from the Court, the jury and from plaintiff and his counsel.

> Plaintiff further alleges that the District Attorney's office and the Public Defender's office were advised of the perjury before and during the trial and none of the prosecutors, investigators, counsel or police involved took any action to correct the miscarriage of justice. The perjurious testimony, the prejudicial investigation and the prosecution's participation in the miscarriage of justice combined to deprive plaintiff of due process and a fundamentally fair trial.

8
9
10
11
12

(Doc. 65, Pltf's Mot. for Sum. J., at 8.)

13
14
15
16

However, the factual submissions provided by the parties in the context of the instant cross-motions suggest that the claims have narrowed to essentially three factual allegations:

> (1)  that investigators and prosecutors fabricated evidence by either coercing the child witnesses into making false statements or by using improper investigative techniques;

17
18
19
20
21
22
23
24

> (2)  that the prosecution was warned both before and during the criminal trial that several of the child witnesses might not be telling the truth, but did nothing with this knowledge; and

> (3)  that both County and State prosecutors failed to timely disclose exculpatory evidence.

25
26
27
28

**19**

1

## IV.  **STANDARD OF REVIEW**

2        Summary judgment is warranted only "if the pleadings,

3   depositions, answers to interrogatories, and admissions on file,

4   together with the affidavits, if any, show that there is no

5   genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c);

6   *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

7   Therefore, to defeat a motion for summary judgment, the non-

8   moving party must show (1) that a genuine factual issue exists

9   and (2) that this factual issue is material. *Id.*  A genuine

10  issue of fact exists when the non-moving party produces evidence

11  on which a reasonable trier of fact could find in its favor

12  viewing the record as a whole in light of the evidentiary burden

13  the law places on that party. *See Triton Energy Corp. v. Square*

14  *D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are

16  "material" if they "might affect the outcome of the suit under

17  the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*,

18  477 U.S. at 248).

19       The nonmoving party cannot simply rest on its allegations

20  without any significant probative evidence tending to support the

21  complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

22  2001).

23                [T]he plain language of Rule 56(c) mandates the
                  entry of summary judgment, after adequate time
24                for discovery and upon motion, against a party
                  who fails to make a showing sufficient to
25                establish the existence of an element essential
                  to the party's case, and on which that party
26                will bear the burden of proof at trial.  In such
                  a situation, there can be "no genuine issue as
27                to any material fact," since a complete failure
                  of proof concerning an essential element of the
28                nonmoving party's case necessarily renders all
                  other facts immaterial.

**20**

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

## V.   DISCUSSION

### A.   Legal Background.

#### 1.   Section 1983.

Plaintiff brings this lawsuit under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws..."  To establish liability under 1983, a plaintiff must show (1) that he has been deprived of a right secured by the United States Constitution or a federal law and (2) that the deprivation was effected "under color of state law."  *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

### 2.   Eleventh Amendment Immunity.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any such suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by the Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  The Eleventh Amendment bars suits against a state for damages or injunctive relief, unless the state has consented to or waived immunity, or Congress has validly abrogated the same.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996)*; In re Harleston*, 331 F.3d 699, 701 (9th Cir. 2003).  The Eleventh Amendment's "reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Calif. v. Doe*, 519 U.S. 425, 429 (1997); *see also Ulaleo v. Paty*, 902 F.2d 1395, 1398 (9th Cir. 1990).

### 3.   Suits Against Government Officials.

The Complaint states that a number of officials are being sued "officially" and "individually."  The distinction between these types of allegations is critical.

### a.   Official Capacity Suits.

Suits against an official in her or his official capacity are treated as suits against the entity on whose behalf that official acts.  In such suits, the real party in interest becomes the entity for which the official works.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  A federal action for monetary damages against an individual State official acting in his official capacity is

barred by the Eleventh Amendment in the same way that an action against the State is barred.  *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).

Although a municipal (e.g., county) official acting in her or his official capacity is not absolutely protected by the Eleventh Amendment, liability only attaches to the municipality under certain circumstances.

> Municipalities cannot be held liable under a traditional respondeat superior theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort.... [T]o establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy.

*Haugen v. Brosseau,* 351 F.3d 372, 393 (9th Cir. 2003)(citing *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658 (1978)).  There are various ways a plaintiff may prove the existence of an unconstitutional municipal policy under the so-called *Monell* doctrine.  These are discussed in context below.

### b.   *Personal Capacity Suits.*

In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [taken] under color of state law." *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999)(citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))(internal quotations omitted).  To establish personal liability in a § 1983 or § 1985 action, it is enough to show that the official, "acting under color of state law, caused the deprivation of a federal right." *Hafer*, 502 U.S. at 25 (internal quotations omitted).  Public officials sued in their personal capacity may assert personal liability defenses, such as

23

qualified immunity. *Dittman,* 191 F.3d at 1027.

### 4. Prosecutorial Immunity.

Prosecutorial immunity protects eligible government officials who perform functions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). "Such immunity applies even if it leaves the genuinely wronged [plaintiff] without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Ashelman v. Pope,* 793 F.2d 1072, 1075 (9th Cir. 1986) (internal quotations omitted). A prosecutor is protected by absolute immunity for any actions that are "quasi-judicial" in nature and are performed "within the scope of [the prosecutor's] authority." *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 678 (9th Cir. 1984).

### 5. Qualified Immunity.

In this case, Defendants assert the defense of qualified immunity on behalf of all the individual Defendants. Deciding qualified immunity entails a two-step analysis. First, a court must ask whether a constitutional violation occurred at all. If the answer to this question is yes, the court must then inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the defendant's actions were lawful. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

//

//

**24**

## B.  **Summary of the Cross-Motions**.

The State Defendants move for summary judgment on all claims against Defendants Bill Lockyer, the Attorney General of California, and Assistant Attorney General R. Todd Marshall. State defendants argue that (1) Lockyer and Marshall both enjoy absolute prosecutorial immunity; (2) Defendant Marshall is also entitled to qualified immunity; and (3) there is no evidence that either Lockyer or Marshall violated Plaintiff's civil rights.

The County Defendants move for summary judgment on all claims against all remaining Defendants (Brownlee, Jagels, Sparks, Fennell, and Dixon).  First, the County maintains that Brownlee and Jagels are entitled to prosecutorial immunity.  The County also argues that it cannot be held liable as a municipality on a number of grounds: (a) the District Attorney and/or his Deputies act on behalf of the <u>State</u> when prosecuting crime; (b) similarly, the Sheriff of Kern County and/or his Deputies act on behalf of the State when performing law enforcement functions; and (c) Plaintiff has failed to establish municipal liability under Monell.  As to all Defendants, the County maintains that there is no evidence supporting the existence of a constitutional violation.  Accordingly, any individual defendants not otherwise immune are entitled to qualified immunity.  Finally, the County asserts that the doctrine of judicial estoppel bars Plaintiff from arguing that the named defendants coerced the child witnesses into lying, because Plaintiff took the position in his habeas corpus proceedings that the child witnesses fabricated the lies

themselves.

Plaintiff's cross-motion squarely presents one legal issue for decision: Whether the California Appellate Court decision granting Faulkner's habeas corpus petition, in which the court reasoned that the child witness recantations were material to the underlying conviction, operates to bar relitigation of the issue of "materiality" for the purposes of establishing a Brady violation.  Plaintiff also appears to request judgment as to liability for at least some of the defendants, but, his motion lacks the essential factual support necessary to entitle him to judgment on any of his claims.[5]  The arguments raised therein, however, are treated as additional arguments in opposition to the defendants' motions.

**C.   Official Capacity v. Individual Capacity; Supervisor Liability As Applied to Defendants Lockyer, Marshall, Sparks, and Jagels.**

**1.   Plaintiff Has Not Established A Personal Capacity Claim Against Defendant Lockyer.**

Neither Defendant Lockyer nor Defendant Marshall can be sued in this court for acts taken in their <u>official</u> capacity, as this would effectively constitute a suit against the State of California.  The Office of the Attorney General of the State of California is an arm of the State entitled to Eleventh Amendment immunity.  *See Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992).  Accordingly, no <u>official</u> capacity lawsuit may lie against

---

[5]      For example, Plaintiff's motion is entitled a "motion for summary judgment," but, in the conclusion section, rather than requesting judgment, plaintiff prays that the court will "deny defendants['] motion for summary judgment."  (Doc. 65 at 20.)

the Attorney General's office or any of its employees.

The inquiry turns to whether Plaintiff has adduced any evidence to support personal liability claims against Lockyer and/or Marshall.  A plaintiff suing a state official in his personal capacity must establish a "connection between the state official and the allegedly unconstitutional action" *Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032 (9th Cir. 1999). It is not disputed that Plaintiff has established a connection between Marshall's acts and the alleged constitutional deprivation.[6]  However, the State defendants suggest that Plaintiff has failed to establish claims against Lockyer in his personal capacity.

Personal participation is required for personal liability under 1983.  *See Taylor v. List*, 880 F.2d 1040, 1047 (9th Cir. 1989).  Plaintiff impliedly alleges here that Lockyer participated in the deprivation of his rights by failing to adequately supervise and/or discipline his Defendant Marshall.[7] But, this cannot form the basis of a personal liability suit against a state official.

//

//

---

[6]     Whether Marshall is protected from personal liability by any personal immunities is discussed below.

[7]     For example, in his motion for summary judgment, Plaintiff alleges that the Attorney General's office improperly withheld copies of the Poeschel reports under the heading "Defendants Implemented Policy So Deficient that It Repudiated Plaintiff's Rights Protected by the Fourth, Fifth and Fourteenth Amendments."  (Doc. 65 at 10-11.)

> A supervisor is only liable for constitutional
> violations of his subordinates if the supervisor
> participated in or directed the violations, or knew of
> the violations and failed to act to prevent them. There
> is no respondeat superior liability under section 1983.

*Id.* at 1046.

Plaintiff cites *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989), for the proposition that supervisory liability may exist even without overt personal participation "if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  Plaintiff quotes *Hansen* out of context and advances an inapposite application of supervisoral liability.  The *Hansen* court reasoned:

> Hansen alleges that the chief of police is guilty of
> malfeasance because he didn't properly train or
> supervise the officers. Under Section 1983, supervisory
> officials are not liable for actions of subordinates on
> any theory of vicarious liability. See Pembaur v. City
> of Cincinnati, 475 U.S. 469, 479 (1986). A supervisor
> may be liable if there exists either (1) his or her
> personal involvement in the constitutional deprivation,
> or (2) a sufficient causal connection between the
> supervisor's wrongful conduct and the constitutional
> violation. Thompkins v. Belt, 828 F.2d 298, 303-04 (5th
> Cir.1987).
>
> Supervisory liability exists even without overt
> personal participation in the offensive act if
> supervisory officials implement a policy so deficient
> that the policy "itself is a repudiation of
> constitutional rights" and is "the moving force of the
> constitutional violation." Id. at 304 (internal
> citations omitted).

*Id.* at 645-46 (emphasis added)(parallel citations omitted).  In support of the language cited by Plaintiff, the Ninth Circuit cites *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). *Thompkins* in turn cites *Monell* for the proposition that supervisory liability may exist even without overt personal

participation.  Both the Ninth Circuit in *Hansen* and the Fifth
Circuit in *Thompkins* were actually referencing the form of
<u>official capacity</u> supervisor liability which may be imposed upon
<u>municipalities</u> under *Monell*.  This does not establish an
additional basis for <u>personal</u> liability applicable to State
officials.

Plaintiff has elicited absolutely no evidence of Lockyer's
personal involvement in the acts that allegedly deprived
Plaintiff of his civil rights.  Lockyer asserts that he was not
even aware of the case until after this lawsuit was filed.
Plaintiff offers no factual rebuttal.  There is no evidence that
Lockyer promulgated or knew of any policy to withhold evidence in
State habeas cases or that such a policy existed or operated in
this case.

Lockyer is entitled to judgment as a matter of law on all
claims brought against him in either his official or personal
capacity.  The State Defendant's motion for summary judgment as
to all claims against Defendant Lockyer is **GRANTED.**  The State
Attorney General is entitled to judgment.

> **2.   Plaintiff Has Not Established Personal Liability
> Claims Against Either Sheriff Sparks or District
> Attorney Jagels.**

Plaintiff has failed to adduce evidence of personal
involvement by either Sheriff Sparks or District Attorney Jagels.

Sparks apparently played no role in investigating the
reports made by the children.  (KSUF #42, 43.)  In fact, there is
no evidence that he had any knowledge of the investigation at
all.  Plaintiff has not established any basis for maintaining a

personal liability claim against Defendant Sparks.  There is no evidence that Sparks promulgated or had knowledge of a policy to falsify or withhold evidence.

The same applies to Defendant Jagels.  Plaintiff has failed to adduce any evidence of Jagels' participation in the investigation and/or prosecution, other than the fact that the legal pleadings associated with the criminal prosecution filed by Brownlee bear Jagels' signature as a matter of protocol, signed by a deputy district attorney.

Defenants' Sparks and Jagels' motions for summary judgment as to any individual-capacity claims against them are **GRANTED**.

### D.   Liability of the County of Kern.

#### 1.   In Federal Court, *Venegas* Does Not Control; The County May be Liable for the Conduct of County Sheriffs and Deputy Sheriffs.

The County argues that it cannot be liable for the allegedly unlawful official acts of those Defendants who are County Sheriffs, because, according to the County, County Sheriffs in California act on behalf of the State, not the County when investigating crime.  The County's defense is based on a recent California Supreme Court case, *Venegas v. County of Los Angeles*, 32 Cal. 4th 820 (2004), which examined whether a county sheriff acted as an agent of the state when conducting a criminal investigation.  The *Venegas* court examined applicable provisions of the California Constitution, several relevant California statutes, and prior California cases to reach the conclusion that "sheriffs act on behalf of the state when performing law enforcement duties."

1        Application of this seemingly straightforward holding is

2   complicated by the fact that Ninth Circuit decisions do not

3   follow and squarely contradict *Venegas*.  The case most on point

4   is *Brewster v. Shasta County,* 275 F.3d 803 (9th Cir. 2001), which

5   holds that county sheriffs in California act on behalf of their

6   county, not the state, during the course of investigating crime.

7   *Brewster* predates *Venegas* and the Ninth Circuit has yet to

8   address Venegas directly.

9        At first glance, the United States Supreme Court's holding

10  in *MacMillan v. Monroe County*, 520 U.S. 781 (1997), suggests that

11  the more recent pronouncement in *Venegas* should control.

12  *MacMillan* held that whether an official acts as a policymaker for

13  a state is a question of <u>state law</u>.  *See also City of St. Louis

14  v. Proprotnik*, 485 U.S. 112, 118-19 (1988)("We begin by

15  reiterating that the identification of policymaking is a question

16  of state law...not a question of federal law.")  The United

17  States Supreme Court has held elsewhere that "[t]he California

18  Supreme Court is the ultimate interpreter of California state

19  law."  *See Johnson v. Fankell*, 520 U.S. 911, 916 (1997).

20       However, there is Ninth Circuit authority that suggests

21  application of the *MacMillan* rule would be inappropriate.  For

22  example, in *Streit v. County of Los Angeles*, 236 F.3d 552 (2001),

23  the Ninth Circuit held that the Los Angles Sheriff's department

24  acted on behalf of the <u>County</u>, not the State, when administering

25  local prison policy.  In *Streit*, Los Angeles County urged the

26  Ninth Circuit to simply adopt the holding of a parallel

27  California case, *County of Los Angeles v. Superior Court*

28

**31**

1  *(Peters)*, 68 Cal App. 4th 1166 (1998), which held that the Los

2  Angeles Sheriff acted on behalf of the State in setting the

3  policies governing the release of prisoners from the Los Angeles

4  County.  The Ninth Circuit rejected Los Angeles County's

5  argument, primarily on the ground that *Peters* was

6  distinguishable.  In addition, the Ninth Circuit noted that "even

7  if the case were on all fours we would not be bound by *Peters*'s

8  conclusion regarding section 1983 liability because such

9  questions implicate federal, not state, law."  236 F.3d at 563.

10  The Ninth Circuit performed its <u>own independent analysis</u> of

11  California law.

12       The Ninth Circuit spoke even more directly in *Weiner v. San*

13  *Diego County*, 210 F3d 1025, 1029 (9th Cir. 2001), which examined

14  whether a California district attorney is a state officer when

15  deciding whether to prosecute an individual.  In *Weiner*, the

16  court acknowledged that *McMillan* calls for an analysis of

17  California law to determine whether an official acts on behalf of

18  the state or a county.  *Id.*

19
20                    <u>This does not mean, however, that we must blindly</u>
                    <u>accept its balancing of the different provisions of</u>
21                    <u>state law in determining liability under § 1983</u>.  In
                    McMillian, the Court stated that "our inquiry is
22                    dependent on an analysis of state law," which does not
                    mean "that state law can answer the question for us by,
23                    for example, simply labeling as a state official an
                    official who clearly makes county policy. But our
24                    understanding of the actual function of a governmental
                    official, in a particular area, will necessarily be
25                    dependent on the definition of the official's function
                    under relevant state law." *McMillian*, 520 U.S. at 785.
26                    We must, therefore, examine California's constitution,
                    statutes, and case law.

27  *Id.* (emphasis added, parallel citations omitted).

28       *Weiner* cautions against the blind acceptance of the Venegas

holding*,* given the existence of a contrary Ninth Circuit rule in *Brewster*, which is binding upon this court.  *See Barapind v. Enomoto*, 400 F.3d 744 at 750-51.

In a concurring and dissenting opinion in *Venegas*, California Supreme Court Justice Kennard acknowledges that the holding in *Venegas* is not binding upon federal courts within the Ninth Circuit:

> Because the Ninth Circuit considers California sheriffs performing law enforcement functions to be county officers, the majority's contrary conclusion here creates a split that results in immunizing sheriffs from section 1983 liability in actions brought in state court while exposing them to liability in identical actions filed in federal court. This effectively drives California civil rights plaintiffs with actions against a county sheriff out of our court system and into federal court. To ensure uniformity in the enforcement of federal civil rights law in both state and federal courts in California, the United States Supreme Court should decide which view is correct.

32 Cal. 4th at 854.

For purposes of this section 1983 case, a federal claim brought in a federal court within the Ninth Circuit, the County of Kern may be liable for the law enforcement-related acts of Sheriff Sparks.  It remains to be determined, however, whether any official capacity claim against him (i.e., against the County) survives summary judgment.[8]

> **2.    The County Cannot be Liable for the Official Acts of a County District Attorney in Preparation for a Prosecution or to Train Others To Prosecute.**

The County argues that it cannot be liable for the official

---

[8]    At least one other district court that has addressed this issue, albeit in an unpublished opinion, is in accord. *See Thomas v. Baca*, 2005 WL 1030247 *3 (C.D. Cal. May 2, 2005)

acts of a District Attorney or Deputy District Attorney.   In

support of this proposition, the County points to both California

cases and binding Ninth Circuit authority.

The operative California case is *Pitts v. County of Kern*, 17

Cal. 4th 340 (1998), which concerned claims against District

Attorney Jagels that are remarkably similar to those brought by

Plaintiff in this case.   Specifically, the complaint in *Pitts*

alleged that

> the County and Jagels, in his official capacity,
> established a pattern, custom, and practice of
> procuring false statements and testimony by threat,
> promise, intimidation, force, bribery, and coercion of
> witnesses, and thereby established an official policy
> governing the conduct of Jagels's employees. [The
> complaint also alleged] the County and Jagels failed to
> provide adequate training, procedures, guidelines,
> rules, and regulations to prevent such conduct by
> district attorney employees, and hence were
> deliberately indifferent to plaintiffs' constitutional
> rights. The official policy and the failure to act were
> actual causes of the deprivation of plaintiffs' rights
> under the Fourth, Fifth, Sixth, and Fourteenth
> Amendments. In particular, [the Pitts] plaintiffs
> assert their constitutional right to a fair and
> impartial trial free of knowingly procured false
> testimony was violated.

*Id*. at 352.   The California Supreme Court concluded in *Pitts* that

the County of Kern could not be liable for Jagels' official acts

because a California district attorney acts on behalf of the

state in preparing to prosecute and prosecuting crimes.   *Pitts*

held that the district attorney was a state actor when "he

establishes policy or trains employees in these areas."

> Just as we have concluded that in California a district
> attorney represents the state when preparing to
> prosecute and when prosecuting criminal violations of
> state law, we further conclude it logically follows
> that he or she also represents the state, and not the
> county, when training and developing policy in these
> areas. No meaningful analytical distinction can be made

> between these two functions. Indeed, a contrary rule
> would require impossibly precise distinctions. The
> district attorney would represent the state when he or
> she personally prepared to prosecute and prosecuted
> criminal violations of state law, but the county when
> training others to do so, or when developing related
> policies. Moreover, anytime the district attorney
> relied on a formal policy to handle a particular aspect
> of a case, that decision would be attributable to the
> county, even though the prosecution itself would be a
> state function. Such a result would be nonsensical, and
> would impose local government liability under the most
> arbitrary of circumstances.

*Id.* at 362.   Under *Pitts*, Kern County cannot be liable for any

acts taken by Defendant Brownlee to prepare to prosecute a crime

or for Defendant's Jagels training and development of policy in

these areas.   This means that, regardless of any proof that would

otherwise satisfy *Monell*, the County cannot be held liable for

allegedly unconstitutional district attorney prosecutorial

policies.   Neither, of course, can the State, as it is immune

under the Eleventh Amendment.

On this issue the Ninth Circuit is in accord.   In Weiner,

210 F3d at 1031, after performing its own independent analysis

under MacMillan, the Ninth Circuit concluded that a district

attorney is a state actor when deciding whether to prosecute an

individual.

Plaintiff argues that this rule simply does not apply to the

allegations in this case because Brownlee and Jagels were acting

as investigators and were not "preparing to prosecute" or

"prosecuting criminal violations of state law."   This argument,

based primarily on a recent Ninth Circuit case concerning

prosecutorial immunity, *Genzler v. Loganbach*, 410 F.3d 630 (9th

Cir. 2005), is discussed in greater detail below.   To the extent

that certain of Defendant Brownlee's acts were investigatory in
nature under *Genzler*, the County could be liable for those acts,
but only if Plaintiff had otherwise satisfied *Monell*.   As is
discussed below, Plaintiff concedes that he has not established
*Monell* liability.

### 3.   Failure of Proof under *Monell*.

Even if Plaintiff could establish that any individual
defendant not otherwise immune had violated Plaintiff's
constitutional rights, the County can only liable be when "action
pursuant to official municipal policy of some nature caused a
constitutional tort...."   *Haugen v. Brosseau,* 351 F.3d 372, 393
(9th Cir. 2003).   "[T]o establish municipal liability, a
plaintiff must prove the existence of an unconstitutional
municipal policy."   *Id*.

Here, there is no direct evidence of the existence of a
policy, nor is there any evidence of a pattern of municipal
activity.   Nevertheless, a municipality may be liable under
*Monell* for a single incident where: (1) the person causing the
violation has "final policymaking authority;" (2) the "final
policymaker" "ratified" a subordinate's actions; or (3) the
"final policymaker" acted with deliberate indifference to a
subordinate's constitutional violations.   *Christie v. Iopa*, 176
F.3d 1231 (9th Cir. 1999).   However, "Proof of a single incident
of unconstitutional activity is not sufficient to impose
liability under *Monell,* unless proof of the incident includes
proof that it was caused by an existing, unconstitutional
municipal policy, which policy can be attributed to a municipal

policymaker." *City of Okl. City v. Tuttle*, 471 U.S. 808, 824 (1985).

> Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation. Under the charge upheld by the Court of Appeals the jury could properly have imposed liability on the city based solely upon proof that it employed a non-policymaking officer who violated the Constitution.

*Id.* Even if one of the *Christie* exceptions applies, a court should hesitate to impose liability based on a single decision.

> Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

Christie, 176 F.3d at 1241 (quoting *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 408-09 (9th Cir. 1997).

Here, there is no evidence of any action on the part of any supervisor at any of the named agencies, let alone any evidence of deliberate indifference.  Plaintiff offers no factual rebuttal to the County's motion for summary judgment on the *Monell* claim and conceded this during oral argument.

37

The County of Kern's motion for summary judgment as to all claims against it is **GRANTED.**  Because Plaintiff has failed to state claims against Defendants Jagels and Sparks in their individual capacities, leaving only the official capacity claims against them, their motion for summary judgment as to all claims against them is also **GRANTED.**

### E.   <u>Prosecutorial Immunity As Applied to Defendants Marshall, Lockyer, Brownlee, and Jagels</u>.

Immunity questions should be resolved at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224 (1991)(per curiam); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(where a case is erroneously permitted to go to trial, the immunity would have been effectively squandered).

### 1.   **Applicable Legal Framework.**

Absolute immunity is most clearly applied to acts taken by a prosecutor to prepare for the initiation of judicial proceedings or for trial and which occur within the role of an advocate. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). However, absolute immunity also applies to investigative activities undertaken in order to prepare a case, *Ybarra,* 723 F.2d at 679, and to actions taken by prosecutors for the purpose of determining whether to bring charges in the first place, *Demery v. Kupperman,* 735 F.2d 1139, 1144 (9th Cir. 1984). As a general rule, absolute immunity applies to acts "having more or less connection with the general matters committed to [the prosecutor's] control or supervision." *Ybarra*, 723 F.2d at 678.

The Ninth Circuit has extended the protection of absolute

immunity to a prosecutor's acts before, during, and after trial:

> Because by hypothesis resentful defendants initiate suits irrationally or for purposes of harassment, they are just as likely to ascribe unconstitutional purposes to the prosecutor's post-trial acts as to his acts before and during trial....

*Demery*, 735 F.2d at 1144-45 (internal citations and quotations omitted).

> Like allegations of misconduct during the trial preparation stage, allegations of misconduct in a prosecutor's post-trial handling of a case can generally be corrected without resort to a civil trial for damages. This claim...is the type that the Supreme Court, in its wisdom, wanted to prevent and recognized would be better handled by various post-trial remedies....

*Id.*

However, the line between covered and non-covered conduct is not always clear.  A recent Ninth Circuit case, *Genzler v. Loganbach*, 410 F.3d 630 (9th Cir. 2005), provides the rule of decision here.  *Genzler* considered the "difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand."  *Id.* at 639 (citing *Buckley*, 509 U.S. at 273).  The Ninth Circuit reasoned that absolute immunity should <u>not</u> apply "[w]hen a prosecutor performs the investigative functions normally performed by a police officer."  However, when a prosecutor "is organizing, evaluating, and marshaling that evidence in preparation for a pending trial, in contrast to the police-like activity of acquiring evidence which might be used in a prosecution," it is more appropriate to apply absolute

**39**

immunity. *Id.* The Ninth Circuit suggested that "the timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process...." *Id.* For example, "when a witness is being coached at or during a break in trial, the prosecutor is protected by absolute immunity even if he or she is instructing the witness to lie." *Id.* (citing *Imbler*, 424 U.S. at 430, 431 n.33). But, timing is not dispositive and must be considered alongside evidence concerning the function that was being performed during the particular interview. *Id.* at 640.

The *Genzler* court applied this approach to two factual scenarios. In the first scenario, prosecutors met with a witness more than one month prior to the preliminary hearing, approximately one week prior to the filing of the complaint, and at least several days prior to the completion of the police investigation and written synthesis. In identifying the function being performed, the Ninth Circuit found that, at the same time the interview was performed, the prosecutor "was engaged in other work that can only be characterized as police-type investigation." *Id.* In examining the function of the interviews, the *Genzler* court focused on the nature of the information obtained by the prosecutor from various witnesses.

> For example, [the prosecutor] and [his supervisor]
> interviewed Scott Davis [a witness to the homicide] on
> April 25, 1996. The notes from the conversation reflect
> only a narrative from Davis' point of view about the
> events of the stabbing. [The prosecutor] joined police
> Detective Warrick in a meeting on June 3, 1996 with
> Shery Logel, Genzler's ex-girlfriend, discussing her
> story about giving Genzler's knife to [another
> witness], and Genzler's character in general. This
> conversation, too, was police-type investigative work,
> as indicated by the nature of the information obtained

**40**

and by the presence of Detective Warrick. On June 5, 1996, [the prosecutor] interviewed Paul Ernst, another witness to the homicide, about what he had seen. Similarly, on June 28, 1996, [the prosecutor] met again with John Belsan, who came forward with evidence about a past fight with Genzler. Again, [the prosecutor's] notes from this conversation reflect only Belsan's narrative about what happened in that confrontation. That [the prosecutor] was engaged in police-type investigative work during the time he met with Flanders supports an inference that he was also engaged in such work when he met with her.

*Id.* at 640-41.  In all of these examples, the prosecutor was still at the stage of gathering information about the incident from various points of view.  Interview noes did not reflect opinions about credibility, appraisal as a witness, or other type of information or evaluation normally characterized as attorney work product.  This information-gathering function in conjunction with the timing of the interviews caused the *Genzler* court to conclude that absolute immunity was not available under the circumstances.  *Id.* at 641.

In the second scenario reviewed by the *Genzler* court, prosecutors met with a witness a a few days after the filing of the criminal complaint (and only a week or so after the interviews analyzed above).  The *Genzler* court did not "view the filing of the complaint as an event after which, by definition, all actions by the prosecutor and his staff are protected by absolute immunity," noting that the preliminary hearing was still more than three weeks away.  The functional analysis revealed that "officials were continuing the process of investigation into the facts that would inform whether there was such probable cause, and the precise charges on which Genzler would stand trial had yet to be determined."  *Id*. at 642.  To reach this conclusion, *Genzler* examined the prosecutor's notes from the

**41**

second meeting

> They are captioned, "Witness Interview." These
> interview notes, like notes taken of other interviews
> by [the prosecutor], record only a narrative of what
> Flanders reportedly said at the meeting about the
> events of April 17 and April 18. The notes state that
> "FLANDERS had told me during a conversation that took
> place at her residence several days earlier that she
> had a clearer picture in her mind of the events
> surrounding HARLESS' death. She felt that she could
> relate them in a more organized fashion than she may
> have done earlier in the investigation." Specifically,
> the notes state that Flanders was "distracted" by the
> arrival of Scott Davis, which is inconsistent with the
> initial statement Flanders made to police. The notes
> thus reflect that [the prosecutors] were in the process
> of gathering information from Flanders during the
> meeting and possibly encouraged her to lie as part of
> their process.

*Id.* (emphasis added).

This provides some guidance about how a court should draw a line between "organizing, evaluating, and marshaling [] evidence in preparation for a pending trial," an activity protected by absolute immunity, and "the police-like activity of acquiring evidence which might be used in a prosecution," for which a law enforcement office or prosecutor only receives qualified immunity. *Id.* The prosecutor was not protected by absolute immunity while interviewing a witness <u>after</u> the filing of the complaint but <u>before</u> the probable cause determination, and where the interview could be characterized as part of the "process of gathering information." It is unclear how much weight should be given to the timing of the interviews in relation to the function performed.[9]

---

[9]   From a practical perspective, if the functional aspect was dispositive, absolute immunity would be essentially eviscerated.

1    *Genzler* cites with approval a Fifth Circuit case, *Cousin v.*

2  *Small*, 325 F.3d 627, 633 (5th Cir. 2003), that provides an

3  example of an interview that __is__ covered by prosecutorial

4  immunity:

5              In *Cousin*, the Fifth Circuit held that a declaration by
             a witness who was allegedly coerced and intimidated
6              into lying eliminated any ambiguity about whether the
             prosecutor was engaged in an investigatory or
7              quasi-judicial function when he interviewed that
             witness.  325 F.3d at 633. The declaration clearly
8              showed that when the prosecutor met with the witness,
             "he did so to tell [the witness] how he should
9              testify."

10  *Genzler*, 410 F.3d at 642.  *Genzler* distinguished *Cousin* on the

11  ground that:

12              Here, by contrast, the interview notes show a process
             of police-type investigation--or, viewed in the light
13              most favorable to *Genzler*, a process of manufacturing
             evidence while performing police-type investigative
14              work--not [the prosecutors] acting as advocates by
             actively preparing Flanders for her testimony in court.
15  *Id.*

16    One clear rule ascertainable from *Genzler* and *Cousin* is that

17  a prosecutor is protected by absolute immunity when the

18  prosecutor is accused of "telling the witness how to testify"

19  because, at that stage, the prosecutor is acting as an advocate[]

20  by actively preparing the witness for testimony in court.  *Id.*

21  If Defendants' conduct falls within this description, they are

22  entitled to absolute immunity.[10]

23  _____

24        [10]   *Genzler* is entirely consistent with *Broam v. Bogan*, 320
    F.3d 1023, 1030 (9th Cir. 2003), the Ninth Circuit's most recent
25  case directly addressing a prosecutor's immunity from civil
    liability for violating *Brady*.  *Broam* affirmed the general
26  proposition that "a prosecutor's decision not to preserve or turn
    over exculpatory material before trial, during trial, or after
27  conviction is a violation of due process under *Brady*."  *Id.*
    However, because a prosecutor enjoys absolute immunity from

28

**43**

### 2.  Absolute Immunity As Applied to Defendant Marshall.

Here, Plaintiff alleges, essentially, that Defendant Marshall was involved in the deprivation of Plaintiff's rights in several ways at several stages in the proceedings.  First, Plaintiff alleges that Marshall failed to timely turn over the Poeschel Reports to the appropriate authorities in violation of *Brady*.  Second, Plaintiff alleges that Marshall improperly conducted interviews of the child witnesses prior to an evidentiary hearing in the habeas proceedings.  Finally, Plaintiff suggests that Marshall acted in bad faith when, despite having concluded during the interviews that Samantha and Breanna had lied, he "fail[ed] to acknowledge plaintiff's claims of illegal search, seizure, and wrongful prosecution following [the] opinion of the California 5th Appellate District Court..." and failed to withdraw the State's opposition to Plaintiff's post-trial motions.[11]

//

//

---

liability "when they are performing a quasi-judicial function," a prosecutor is nonetheless immune from civil liability for a Brady violation that takes place within his or her quasi-judicial function.  *Id*. (emphasis added).  *Genzler* expands upon *Broam's* holding to provide guidance as to when a prosecutor's acts should be deemed "quasi-judicial" in nature.

[11]     It is possible to interpret Plaintiffs allegations as alleging that Marshall's conduct during the interviews of Samantha and Breanna violated Plaintiff's constitutional rights, but this would make little sense, given that Marshall concluded at the end of these meetings that the two girls had  lied and there is no suggestion Marshall had any role in shaping the girls' statements.

1

2

### a. Marshall's alleged failure to turn over the Poeschel Reports.

3      Marshall first became involved in the case after the initial

4 appellate brief was filed on September 26, 2000. Marshall filed

5 the State's response on behalf of the People on November 14,

6 2000. At that time Marshall had no knowledge of the potential

7 recantations. On December 4, 2001, Marshal received a copy of

8 the Poeschel Reports. Marshall assumed that Faulkner's counsel

9 also had a copy. (Marshall Decl., at ¶9.) On December 15, 2001,

10 Wijsen filed a motion for bail pending appeal on behalf of

11 Faulkner. Marshall filed an opposition to the bail motions and

12 attached the Poeschel Reports to it as exhibits. To the extent

13 that this evidence supports the factual assertion that Marshall

14 failed to hand over the Poeschel reports, any such failure

15 occurred in the context of Marshall's work as an attorney and

16 advocate in the appellate/habeas proceedings. Marshall is

17 entitled to absolute immunity for this activity.

18

### b. Marshall's interviews of the child witnesses prior to the habeas evidentiary hearing.

19

20      On June 21, 2001, Wijsen filed a petition for a writ of

21 habeas corpus with the Fifth Appellate District Court on

22 Faulkner's behalf. The petition alleged that several of the

23 trial witnesses had recanted their trial testimony. On October

24 10, 2001, the Appellate Court issued an order to show cause to

25 the Kern County Superior Court why Faulkner's petition should not

26 be granted. The Superior Court held an evidentiary hearing on

27 June 17 and 18, 2002.

28

**45**

1      Prior to the evidentiary hearing, in early February 2002,

2  Marshall interviewed all of the child witnesses in the company of

3  California Department of Justice Special Agent Morales.  (*See*

4  Pltf's Ex. R, Attch. E-R.)  Marshall asserts that he conducted

5  the interviews "for the sole and exclusive purpose of preparing

6  for the hearing, including assessing the credibility of potential

7  witnesses."  (Marshall Decl. at ¶ 10.)  During those interviews,

8  Marshall concluded that "[i]t was clear they had either lied at

9  trial or were subsequently lying about having fabricated their

10  trial testimony...Nevertheless, because the jury had acquitted

11  Faulkner of all counts relating to those two anyway, and because

12  the counts of which he was convicted solely and independently

13  related to the third alleged victim, Brandon, who remained

14  steadfastly consistent in his own accounts, it was my good faith

15  belief that the boy's testimony independently supported those

16  convictions."  (*Id.*)

17      Plaintiff disputes Marshall's asserted "purpose" for the

18  meetings, pointing to the content of the interviews conducted by

19  Marshall.  In particular, Plaintiff asserts that Marshall acted

20  in "bad faith" when he "tried to get Brandon to change his

21  testimony by oppressive questioning."  Marshall asked Brandon

22  whether Faulkner touched any of the children.  When Brandon

23  answered "No," Marshall attempted to rephrase the question as

24  "Were you paying attention to what he..." when Brandon cut him

25  off and said "No he didn't."  Marshall then asked "You didn't see

26  him do it or you weren't paying attention?"  Brandon answered "He

27  didn't."  Marshall then asked "You didn't see him do it?"

28

**46**

Brandon answered "I saw him but he didn't do it."  Plaintiff
asserts that "Marshall was attempting to get this boy to say what
the girls had been denying for over two years."  (Doc. 93, Pltf's
Reply to State's Opp'n to Pltf's Mot. for Sum. J., at 4.)
However, even accepting Plaintiff's theory about Marshall's
intent, Marshall's questioning was a reasonable and necessary
part of the process of preparing witnesses and the People's case
for the evidentiary hearing.  The interview was designed to probe
the depth of Brandon's knowledge and observations.  This falls
squarely within the pattern of questioning in *Cousin*, the Fifth
Circuit case cited with approval by the Ninth Circuit in *Genzler*.
In *Cousin*, a prosecutor met with the witness "to tell [the
witness] how he should testify."  Even though this interview was
arguably coercive, it was covered by absolute immunity because
the interview was designed to prepare the witness to testify.
*Cousin*, 325 F.3d at 633.  Marshall's conduct during his
interview of Brandon is protected by absolute immunity because he
was actively preparing the witness for testimony in court.
*Genzler*, 410 at 643.

//

//

//

//

//

//

//

1

2

###        c.    *Bad faith allegations.*

3
4    Finally, Plaintiff suggests that Marshall acted in "bad

5 faith"[12] when, despite having concluded during the interviews

6 that Samantha and Breanna had lied, he "fail[ed] to acknowledge

7 plaintiff's claims of illegal search, siezure, and wrongful

8 prosecution following [the] opinion of the California 5th

9 Appellate District Court..." and failed to withdraw the State's

10 opposition to Plaintiff's post-trial motions.  These are

11 decisions on legal strategy Marshall made in the course of his

12 role as a prosecutor and are therefore covered by absolute

immunity, even if made in bad faith or with an improper motive.

13    Defendant Marshall's motion for summary judgment as to all

14 claims against him is **GRANTED**.

15        **3.   Absolute Immunity As Applied to Defendant Lockyer**.

16    The claims against Lockyer have been dismissed because

17 Plaintiff has not established any basis for personal liability

18 against Lockyer.  Even if this were not the case, Lockyer is

19 entitled to prosecutorial immunity.  Lockyer's only direct

20 participation in the case is the fact that his name appears above

21        [12]   Plaintiff repeatedly asserts that Marshall is liable
22 because he acted in "bad faith."  Plaintiff appears to make these
   arguments in the context of the qualified immunity standard, but
23 to the extent that he asserts a "bad faith" exception to absolute
   immunity, no such exception exists.  *Imbler*, 424 U.S. at 427 ("To
24 be sure, [prosecutorial] immunity does leave the genuinely
   wronged defendant without civil redress against a prosecutor
25 whose <u>malicious or dishonest action</u> deprives him of liberty.
   But the alternative of qualifying a prosecutor's immunity would
26 disserve the broader public interest. It would prevent the
   vigorous and fearless performance of the prosecutor's duty that
27 is essential to the proper functioning of the criminal justice
   system.")(emphasis added).
28

**48**

the signature line of pleadings as attorney, filed and signed by
Marshall as Lockyer's deputy.  Where a prosecutor's involvement
is "limited to the use of his title in the formal pleadings of
the state criminal case," absolute immunity applies.  *Freeman on
Behalf of the Sanctuary v. Hittle*, 708 F.2d 442, 443 (9th Cir.
1993).  Plaintiff has offered no other evidence or legal grounds
upon which to find otherwise.  Defendant Lockyer's motion for
summary judgment as to all claims against him is **GRANTED**.

### 4.   Absolute Immunity As Applied to Defendant Brownlee.

Defendant Brownlee asserts that he is entitled to absolute
immunity for his allegedly unlawful conduct.  Plaintiff objects,
asserting that Brownlee was acting in an investigatory capacity,
rather than in his role as an advocate, when he allegedly
violated Plaintiff's constitutional rights.  The operative
allegations against Brownlee are:  (1) that he failed to disclose
to Faulkner and/or act upon the potentially exculpatory evidence
provided by Ms. Blankenship; (2) that he used coercive or
suggestive tactics while interviewing the child witnesses prior
to the criminal trial; and (3) that he ordered an investigator to
conduct new interviews of the child witnesses after the
conclusion of the criminal trial and then failed to disclose the
content of those interviews to the appropriate authorities.  The
threshold inquiry is whether the activities in which Brownlee
engaged are the type covered by absolute immunity under *Genzler*.

//

//

**49**

### a. *Mary Blankenship's warnings to Brownlee of Potentially Perjurious Testimony.*

The parties dispute whether and when Mary Blankenship informed Brownlee of her belief that one or more of the child witnesses might be lying.  There is evidence that Ms. Blankenship warned Brownlee of her "doubts" both before and after the trial, although the exact timing of Ms. Blankenship's warning(s) is not clear from the record.  (Pltf's Ex. A  at 33, 43.)  Brownlee denies ever having received such warnings.  For the purposes of this motion, where disputed facts must be viewed in a light most favorable to the non-moving party, it must be assumed that Ms. Blankenship communicated these warnings to Brownlee, both before and after the trial.

*Genzler* controls whether absolute immunity applies in this case.  The inquiry demands an examination of both the timing and the nature of Brownlee's interactions with Ms. Blankenship.  In *Genzler*, the prosecutor was not protected by absolute immunity for acts that can be characterized as part of the "process of gathering information."  *Genzler*, 410 F.3d at 642.  In contrast, a prosecutor is protected by absolute immunity if he or she "is acting as an advocate by actively preparing the witness for testimony in court."  *Id*. at 643.

### (1)   **The pre-trial warnings**.

The exact timing of Ms. Blankenship's purported <u>pre-trial</u> warning(s) to Brownlee is not clear.  The only relevant evidence is the following excerpt from Ms. Blankenship's testimony:

**Q:**   Ms. Blankenship, Mr. Marshall just asked you if you delayed a year before you told anyone of your doubts.  Isn't it correct that you told Mr. Brownlee even before trial?

**A:**   Yes, I did. I'm Sorry.

(*Id.* at 43.)  Ms. Blankenship testified that she accompanied the girls to meetings with Brownlee in Brownlee's office on two or three occasions.  (Pltf's Ex. A at 43.)  It can be inferred from this evidence that she spoke with Brownlee at these meetings.  No other pre-trial interactions between Ms. Blankenship and Brownlee are referenced in the record.

Under *Genzler*, these pre-trial witness interviews must be examined in the overall context of Brownlee's involvement in the prosecution.  Brownlee was first assigned to handle Faulkner's prosecution one week before the preliminary hearing scheduled on December 14, 1999.  Brownlee had no contact with either Deputy Fennel or Dixon or with any witness until the morning of the preliminary hearing.  Just before that hearing, Brownlee spoke with Samantha Spoon about the incident.  Brownlee asserts that he conducted this interview because he thought that she might need to testify at the hearing and he wanted to know what she would say.

With respect to timing, as in *Genzler*, where the prosecutor was not entitled to absolute immunity for interviews conducted prior to the probable cause hearing, the probable cause determination had not yet been made when Brownlee met with Samantha prior to the preliminary hearing.  However, unlike *Genzler*, where the interviews took place several weeks prior to the preliminary hearing, Brownlee met with Samantha the same day,

**51**

1    immediately prior to a judicial hearing, to prepare himself to

2    present the People's case at that hearing.  (Brownlee Decl. at

3    ¶4.)   In so doing, Brownlee was "acting as an advocate by

4    actively preparing the witness for testimony in court," a

5    function that is protected by absolute immunity.  *See Genzler,*

6    410 at 643.  Although it is a close call, Brownlee's conduct in

7    this circumstance is best described as "organizing, evaluating,

8    and marshaling []evidence in preparation for a pending trial [or

9    adversarial hearing], in contrast to the police-like activity of

10   acquiring evidence which might be used in a prosecution..."  *Id.*

11   at 639.  Brownlee is entitled to absolute immunity for his

12   interview of Samantha immediately prior to the preliminary

13   hearing.  Even if Ms. Blankenship warned him in the context of

14   this interview of her belief that Samantha might not be telling

15   the truth, absolute immunity shields Brownlee from civil

16   liability for failure to disclose this potentially exculpatory

17   evidence.  *See Broam*, 320 F.3d at 1030.

18       Faulkner's trial was set for early May 2000.  At some point

19   "within days" of the trial (the exact date of the interviews

20   appears nowhere in the record), Brownlee interviewed all of the

21   child witnesses.  The probable cause determination had already

22   been made by an independent judge and the preliminary hearing

23   concluded.  Again, the circumstances suggest a close connection

24   with the upcoming criminal trial.  No contrary evidence has been

25   submitted.

26       Even assuming that Ms. Blankenship did warn Brownlee during

27   any of these pre-trial witness interviews that either or both of

28

**52**

the girls might be lying, Brownlee is shielded by absolute
prosecutorial immunity.

### (2)  **The post-trial warnings**.

   The record is also unclear as to the timing of the purported
post-trial warning(s).  Ms. Blankenship testified that, after the
trial, she thought the girls had probably lied and then called
Brownlee to tell him as much.

> **The Court:** ...The question is, after the trial, what
>          did you do because you thought the girls were
>          probably lying, and the first thing you did is you
>          called Brownlee?
>
> **The Witness:**   Correct.
>          ***
>
> **Q:**  When did you do that?  When did you call Mr.
>          Brownlee in relation to the trial?
>
> **A:**  I talked to Mr. Brownlee after the trial about it
>          also.
>
> **Q:**  How long after the trial is what am getting at.
>          Do you know?
>
> **A:**  When I had called Mr. Brownlee's office to find
>          out about the sentencing, and that's when I had
>          told him what took place.

(*Id.* at 33.)[13]

---

   [13]   Ms. Blankenship also testified that she expressed
similar doubts to a "lady from the District Attorney's Office,"
in September 2000.  (*Id.* at 44.)

> **Q:**  And you also testified -- well, did you in fact
>          talk, yourself, with the D.A. investigator in
>          September of 2000?
>
> **A:**  I talked with her -- with a lady from the District
>          Attorney's Office.
>
> **Q:**  Did you express that same doubt to her?
>
> **A:**  I did.

1   No precise time frame for this conversation is provided in

2   the record.  Ms. Blankenship's mention of the word "sentencing"

3   suggests that this communication took place in close proximity to

4   Plaintiff's sentencing hearing.  Sentencing is a phase that is

5   "intimately associated with the judicial phase of the criminal

6   process," and is therefore protected by absolute immunity from

7   civil liability.  *See Broam*, 320 F.3d at 1028-29; *see also*

8   *Sadoski v. Mosley*, 435 F.3d 1076 (9th Cir. 1996)(Gould, J.,

9   concurring)(prosecutors were absolutely immune for participation

10  in re-sentencing and parole revocation proceedings).

### b.   Brownlee's alleged use of improperly suggestive interview techniques.

13  Faulkner also alleges that Brownlee used improperly

14  suggestive interview techniques with Samantha.  Specifically,

15  Faulkner points to the following except from Ms. Blankenship's

16  testimony:

> **Q:**   Do you recall Mr. Brownlee ever suggesting to Samantha answers?
>
> **A:**   Yes, I do.
>
> **Q:**   Did you ever hear him suggest to Samantha that something actually happened in a different way from what she had said?
>
> **A:**   Yes, I did.
>
> **Q:**   And then did Samantha then agree with Mr. Brownlee's version
>
> **Mr. Marshall:**  I am going to object to both Mr. Brownlee's suggestion and Samantha's responses as being hearsay.

26  But, it is undisputed that Brownlee's only direct interactions

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  But, Plaintiff does not name this "lady" as a defendant nor connect her to Defendant Brownlee in any way.

**54**

with Samantha occurred either immediately prior to the
preliminary hearing or just prior to the trial itself.  All of
these meetings were in preparation for her potential testimony as
a witness in judicial proceedings, were not investigatory in
nature, and afford Brownlee absolute immunity.  This immunity
protects Brownlee even if he did tell Samantha "what she should
say."

### c. Brownlee's involvement in the preparation and disclosure of the Poeschel reports.

Faulkner was convicted in early May 2000, and was sentenced
to prison in June 2000.  In September 2000, Brownlee received
information that one or more of the girls might be changing their
trial testimony.  Brownlee was not aware at that stage of the
extent of the witnesses' intent to recant.  Brownlee directed
District Attorney Investigator Patricia Poeschel to interview the
children.  These interviews occurred in September, October, and
November 2000.  On November 21, 2000, Brownlee received reports
from Poeschel (the Poeschel Reports) summarizing the interviews,
which indicated that two of the girls said they lied about
Faulkner grabbing Samantha.  Brownlee claims that he immediately
made a copy of the reports and sent them to the Public Defender's
office that same day.  The Public Defender, Leslie Greer, admits
having received the reports from Brownlee and asserts that she
forwarded them on to Wijsen.  Faulkner asserts, however, that the
reports were never given to Wijsen and has presented some proof
to support this assertion, including the circumstantial evidence
that Wijsen did not reference the reports in his appellate brief

or the initial habeas petition.  For the purposes of this motion, Faulkner's version of events must be credited.  No explanation is provided for any failure of Wijsen to receive the Poeschel Reports Greer sent to him.

The threshold inquiry is whether, under the *Genzler* functional analysis, Brownlee's relevant conduct is shielded by absolute immunity.  The Ninth Circuit has extended the protection of absolute immunity to a prosecutor's acts before, during, and after trial:

> Because by hypothesis resentful defendants initiate suits irrationally or for purposes of harassment, they are just as likely to ascribe unconstitutional purposes to the prosecutor's post-trial acts as to his acts before and during trial....

*Demery*, 735 F.2d at 1144-45 (internal citations and quotations omitted).

> Like allegations of misconduct during the trial preparation stage, allegations of misconduct in a prosecutor's post-trial handling of a case can generally be corrected without resort to a civil trial for damages. This claim...is the type that the Supreme Court, in its wisdom, wanted to prevent and recognized would be better handled by various post-trial remedies....

*Id.*

However, absolute immunity only attaches to a prosecutor's post-trial activities that are related to his or her role as an advocate.  In *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992), the Seventh Circuit declined to extend absolute immunity under facts strikingly similar to this case.  In that case, two individuals, Houston and Brown, were convicted of murder.  While their appeals were pending, a cooperating witness told law enforcement officers that neither Houston nor Brown had committed

**56**

the murders.  The witness specifically stated that other individuals were responsible for the murder.  Those two other witnesses subsequently confessed to law enforcement officers. None of this information was disclosed to Houston or Brown until, after they learned of the confessions on their own, and their defense attorneys then confronted the prosecutors.

The *Houston* court held that the prosecutors were not absolutely immune from liability under the circumstances, in part because the appeal was being handled by different government attorneys at the time the prosecutors learned of the other witnesses' confessions.  In reaching this conclusion, the Seventh Circuit engaged in a lengthy examination of the historical bases for and purposes of prosecutorial immunity before determining that absolute immunity was not appropriate under those circumstances.  *See also Spurlock v. Thompson* 330 F.3d 791, 799 (6th Cir. 2003)(prosecutor not entitled to absolute immunity for allegedly unlawful conduct more than a year after completion of criminal trial).  In contrast, where a prosecutor is still handling post conviction motions and/or the direct appeal, absolute immunity applies.  *Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994).

Here, by the time Brownlee learned of the recantations in September 2000, Faulkner had already filed his notice of appeal (in June 2000), and appellate counsel had been appointed (in August 2000).  By the end of September 2000, Marshall had been assigned to the case.  Accordingly, when Brownlee received the Poeshel reports in November and disclosed them to Leslie Greer,

**57**

he was no longer prosecuting the case and absolute immunity would not apply to this particular conduct.

Defendant Brownlee's motion for summary judgment on absolute immunity grounds is **GRANTED** as to all the factual allegations against him, except that the motion is **DENIED** with respect to his involvement in the preparation and disclosure of the Poeschel reports.  Whether this remaining allegation against Brownlee is sufficient to overcome qualified immunity is discussed below.

### 5.   Absolute Immunity of Defendant Jagels.

As discussed, Plaintiff has failed to elicit any proof in support of a *Monell* claim against the County and summary judgment has been granted to Defendant Jagels on any official capacity claims against him.  Nor has Plaintiff established that Defendant Jagels personally participated in or ratified with knowledge any alleged constitutional violations, entitling Jagels to summary judgment on any individual capacity claims against him.  Even if Plaintiff could establish an individual capacity claim against Jagels, he would be entitled to absolute immunity, as his deputy did no more than sign under the authority of the District Attorney's title.  *Freeman*, 708 F.2d at 443.  There is no evidence to show Jagels knew of, directed, participated in, or established and implemented a policy that made him responsible for Brownlee's conduct.

//

//

//

**F.   Qualified Immunity Applied to the Remaining Claims.**

The County and the State move for summary judgment on behalf of all the remaining individual defendants on the grounds that all are entitled to qualified immunity.  Plaintiff cross-moves for summary judgment on the ground that defendants' actions wrongfully deprived plaintiff of his constitutional rights.

**1.   Qualified Immunity Legal Framework.**

The standard for qualified immunity implicates the legal bases for the alleged constitutional violations.  Deciding qualified immunity entails a two-step analysis.  First, a court must ask whether a constitutional violation occurred at all.  If the answer to this question is yes, the court must then inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the officer's actions were lawful.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The traditional summary judgment approach should be used in applying the first step of the *Saucier* analysis:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right? Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir. 2004) (internal citations and quotations omitted)*.*  In the second step, the court asks whether it would be clear to a reasonable official that the official's conduct was unlawful in the

**59**

situation confronted.  Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact...summary judgment is not appropriate." *Wilkins v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring)).

Under *Saucier*, the first question is whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right."  Here, Plaintiff alleges:

(1)   that investigators and prosecutors fabricated evidence by either coercing the child witnesses into making false statements or by using improper investigative techniques;

(2)   that the prosecution was warned both before and during the criminal trial that several of the child witnesses might not be telling the truth, but did nothing with this knowledge; and

(3)   that both County and State prosecutors failed to timely disclose exculpatory evidence.

Some of these claims pertain only to Defendants who are protected by absolute immunity.  Defendants Marshall, Lockyer, Jagels, and Sparks are entitled to summary judgment on absolute immunity grounds.  Defendant Brownlee is protected by absolute immunity for almost all of his actions.  The sole exception is that he is protected only by qualified immunity for his conduct regarding the disclosure of the Poeschel reports.  Defendants

Fennell and Dixon are likewise protected only by qualified
immunity.  Accordingly, the remaining claims are:

    (1)   that Defendants Fennel and Dixon fabricated evidence by
either coercing the child witnesses into making false
statements or by using improper investigative
techniques;

    (2)   that Defendant Brownlee learned <u>after the trial</u> that
several of the child witnesses intended to recant their
trial testimony, but did not timely or adequately
disclose the information to Plaintiff's counsel.

### 2. Deliberate Fabrication/Knowingly Pursuing Prosecution of an Innocent Defendant.

The first allegation is whether Defendants Fennel and Dixon
used improper investigative techniques, falsified evidence,
and/or pursued Plaintiff's prosecution, despite awareness of his
innocence.

These claims are controlled by a line of cases beginning
with *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), in which
the Ninth Circuit has closely circumscribed the range of faulty-
investigation law enforcement claims which may form the basis for
Section 1983 liability in the conduct of child abuse
investigations and interrogations.  In *Devereaux*, a foster parent
who had been accused of sexual misconduct with his foster
children brought a Section 1983 action against various government
entities and law enforcement officials, alleging that defendants
manipulated and coerced the children into giving false evidence

against him, and withheld and ignored exculpatory evidence.  *Id*.
Defendants asserted qualified immunity, and the district court
granted summary judgment.  *Id*.  Applying the *Saucier* two-step
qualified immunity approach, the Ninth Circuit ruled that

> there is no constitutional due process right to have
> child witnesses in a child sexual abuse investigation
> interviewed in a particular manner, or to have the
> investigation carried out in a particular way.

*Id*.  Instead, the Ninth Circuit requires that a plaintiff:

> must, at a minimum, point to evidence that supports at
> least one of the following two propositions: (1)
> [d]efendants continued their investigation of
> [plaintiff] despite the fact that they knew or should
> have known that he was innocent; or (2) [d]efendants
> used investigative techniques that were so coercive and
> abusive that they knew or should have known that those
> techniques would yield false information.

*Id.*  Deliberate falsification of evidence is required; mere
faulty investigative techniques will not suffice to state a
Section 1983 due process claim.  *Id*.

     In *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir.
2003), the Ninth Circuit ruled that "[a] police officer's failure
to preserve or collect potential exculpatory evidence does not
violate the Due Process Clause unless the officer acted in bad
faith."  *Cunningham*, 345 F.3d at 812.  Plaintiff argued that the
officer acted in bad faith because he failed to document his
interrogations and did not keep a record of the two children's
statements denying sexual abuse.  The Ninth Circuit rejected this
argument, on the grounds that the officer "likely believed his
tactics were lawful."  *Id*.  *Accord Gausvik v. Perez*, 345 F.3d
813, 318 (9th Cir. 2003).

Under the first step of the *Saucier* analysis, the court must analyze whether the undisputed facts, together with the disputed facts viewed in a light most favorable to Plaintiff, show the Defendants' conduct establish a constitutional violation under *Devereaux*.

The theory of Plaintiff's case against Fennel or Dixon is that their "failure to investigate the outlandish stories of the minor witnesses deprived plaintiff of his right to be free from unlawful seizure and of due process."   (Doc. 70, at 15 (emphasis added).)

> Defendants' fail[ed] to conduct an investigation at the scene of plaintiff's arrest, when all physically obvious evidence pointed to the impossibility of a factual scenario as alleged by minor witnesses Samantha Spoon and Breanna Blanketship.  The two eight year old witnesses informed Defendant Sheriff Deputies Fennel and Dixon that Faulkner "picked up one of the girls and placed her on the handlebars of his bicycle while it sat on its kick-stand." [Exhibit E, to County MSJ, p. 13 of 19] Fennell then reported that Samantha "jumped off the bicycle and ran.  Faulkner attempted to put Brandon on the bicycle (illegible), but he was able to pull away and run." [Exhibit E, to County MSJ, p. 13 of 19].  Any person familiar with the weight and balance of a bicycle on its kickstand, and especially a Sheriff's Deputy familiar with chasing suspects on bicycles and making arrests in various factual situations knows that this factual scenario is impossible.
>
> Defendants' assertion that the witness lied, and therefore Defendant Sheriff Deputies Fennel and Dixon should be absolved of liability for their conduct at the scene of the arrest, is a non sequitur.  Defendants Fennell and Dixon were trained law officers sent to the scene to ascertain if a crime had been committed.  Mere allegations, illogical in nature, do not provide probable cause to arrest anyone without a proper investigation. [Exhibit E, to County MSJ, incident report; Plaintiff's Exhibit "O," Wijsen letter; Plaintiff's Exhibit "C", Poeschel Reports]

(*Id.* at 13-14.)

1    These allegations are controlled by the *Devereaux* line of

2   cases.  To overcome qualified immunity in a faulty investigation

3   case, Plaintiff must "point to evidence that supports at least

4   one of the following two propositions: (1) [d]efendants continued

5   their investigation of [plaintiff] despite the fact that they

6   knew or should have known that he was innocent; or (2)

7   [d]efendants used investigative techniques that were so coercive

8   and abusive that they knew or should have known that those

9   techniques would yield false information."

10              Interviewers of child witnesses of suspected sexual
                abuse must be given some latitude in determining when
11              to credit witnesses' denials and when to discount them,
                and we are not aware of any federal
12              law--constitutional, decisional, or statutory--that
                indicates precisely where the line must be drawn.
13

14   263 F.3d 1070.

15    Here, Plaintiff's only argument relevant to Deputies Fennel

16   and Dixon is that it is impossible for a child to sit on the

17   handlebars of a bike while that bike leaned on its kickstand,[14]

18   and no reasonable law enforcement investigator could accept the

19   assertion as true.  Even assuming the truth of this assertion,

20   this does not provide a sufficient factual basis to defeat

21   qualified immunity.  It is far from "clearly established" that

22   such a scenario is impossible and a reasonable officer could

23   believe that Defendants Fennel and Dixon's actions were lawful.

24   *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).   To the extent

25

26   _____

27        [14]   The County makes the obvious counterpoint: "Doubtless,
     thousands of children [who ride on bike handlebars] would dispute
28   this claim."  (County's Reply at 10 n.6)

that the complaint also impliedly asserts a *Devereaux* violation against Defendant Brownlee, it is difficult to imagine how the only conduct for which Brownlee is not protected by absolute immunity -- his alleged failure to timely and properly disclose the Poeschel reports -- fits into the *Devereaux* framework. Arguendo, the State's continued insistence upon Plaintiff's guilt throughout the appeal could be interpreted as "continu[ing] [an] investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent...," which is prohibited by Devereaux.  But, it was Marshall, not Brownlee, who made the decision to defend the conviction on appeal and habeas corpus. As discussed, Marshall is absolutely immune for his conduct in post-trial proceedings.  The more plausible basis for Brownlee's liability is the failure to disclose/ *Brady* claim, discussed below.

### 3.    Failure to Disclose Exculpatory Evidence.

The only remaining claim is the allegation that Defendant Brownlee failed to adequately disclose the existence of the Poeschel reports after trial.  Under *Saucier, the* inquiry is whether the undisputed facts, together with the disputed facts viewed in the light most favorable to Plaintiff, indicate that Brownlee violated a clearly established constitutional right. The first question is whether the facts show the existence of a constitutional violation.  In this case, this first inquiry is complex.

//

//

**65**

### a. Is there any constitutional duty to disclose evidence obtained after conviction and sentencing?

A threshold question is whether Brownlee was under any <u>constitutional</u> duty to disclose the evidence in question to anyone at all, given that the evidence was discovered <u>after</u> Plaintiff's trial and conviction.

Plaintiff maintains that Brownlee was under a "continuing duty pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose any "newly acquired" exculpatory evidence to Faulkner's counsel and to the Court." (Doc. 70, Pltf's Opp'n to Kern's Mot., at 9.) In support of this proposition, Plaintiff cites *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), *Imbler v. Pachman*, 424 U.S. 409, 427 n.25 (1976), *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992). Neither *Ritchie* nor *Imbler* support Plaintiff's contention. *Ritchie* concerned evidence known to the prosecution prior to trial. 480 U.S. at 43-47. The cited passage from *Imbler*, footnote 25, suggests that any continuing duty to disclose exculpatory evidence discovered post trial is an ethical responsibility, not a constitutional one:

> The possibility of personal liability also could dampen the prosecutor's exercise of his duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. <u>At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction. Cf. ABA Code of Professional Responsibility s EC 7-13 (1969); ABA Standards, supra, s 3.11.</u> Indeed, the record in this case suggests that respondent's recognition of this duty led to the post-conviction hearing which in turn resulted ultimately in the District Court's granting of the writ of habeas corpus.

424 U.S. at 427 n.25.

*Thomas* directly support Plaintiff's assertion. *Thomas* concerned a state prisoner pursuing federal habeas relief from a sexual assault conviction. Thomas asserted several grounds for habeas relief, including that the state suppressed a semen sample which would have exonerated him of the sexual assault charge. All of his claims were procedurally defaulted in state court and he was unable to demonstrate cause for his procedural defaults. Consequently, the Ninth Circuit reasoned that the habeas claims would only be cognizable in federal court if Thomas could establish a "colorable showing of factual innocence." Noting that the "semen sample, or tests thereof, might enable him to make such a showing," the Ninth Circuit reasoned that

> [T]he state is under an obligation to come forward with any exculpatory semen evidence in its possession. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). We do not refer to the state's past duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding. Thomas has alleged that the state possesses evidence which would demonstrate his innocence and revive an otherwise defaulted ground for issuing a writ. Under the circumstances, fairness requires that on remand the state come forward with any exculpatory evidence it possesses. If no such evidence exists, the state need only advise the district court of that fact.

979 F.2d 749-50 (emphasis added)(parallel citations omitted).[15]

---

[15]   The County points to a district court case, *Hankison v. Board of Prison Terms*, 768 F. Supp. 720, 722 (N.D. Cal. 1991), decided one year prior to *Thomas*, in support of its assertion that "[w]hen the prosecution does not learn of the exculpatory evidence until after the trial, there is no *Brady* error for failing to provide it to the defense." In *Hankison*, a habeas case, the petitioner challenged his conviction on the ground that prosecutors failed to disclose a pre-verdict witness recantation to his defense counsel. The district court, after an evidentiary hearing, found that the prosecution was unaware of the

1    Although *Thomas* establishes a <u>duty</u> to disclose information

2  discovered after trial, the existence of this duty does not end

3  the inquiry into the nature of the constitutional right as it

4  must be applied in a civil lawsuit brought pursuant to section

5  1983.

6           ***b.     What is the legal standard for a Brady claim***

7                ***brought under Section 1983?***

8    In the context of the criminal process, "[t]here are three

9  components of a true *Brady* violation: [t[he evidence at issue

10 must be favorable to the accused, either because it is

11 exculpatory, or because it is impeaching; that evidence must have

12 been suppressed by the state, either willfully or inadvertently;

13 and prejudice must have ensued." *Strickler v. Greene*, 527 U.S.

14 263, 281-82 (1999).  Also in the criminal context, *Brady* imposes

15 a "no fault" obligation upon prosecutors to turn over exculpatory

16 evidence.  A prosecutor's withholding of exculpatory, material

17 evidence is grounds for a new trial, whether the withholding was

18 innocent, negligent, or intentional.  *See Brady v. Maryland*, 373

19 U.S. 83, 87 (1963).

20 ───────────────

21 recantation until <u>after</u> the verdict was announced.  *Id*. at 722.
   The district court reasoned that habeas relief was not warranted
22 on Brady grounds because, although "[t]he suppression by the
   prosecution of evidence favorable to an accused upon request
23 violates due process...[a] Brady error cannot occur where the
   prosecution and law enforcement do not possess and are unaware of
24 the favorable evidence."  *Id*.  In light of the clear
   pronouncement in *Thomas*, *Hankison* is not particularly persuasive.
25 *Hankison's* central focus was whether the <u>trial</u> comported with due
   process.  Here, in contrast, the issue is whether Brownlee was
26 under any obligation to disclose exculpatory evidence discovered
   after trial.  *Thomas* answers this question in the affirmative.
27

28

**68**

However, a series of cases have called into question whether a similar "no fault" standard applies in civil cases where liability is based upon a *Brady* violation.  In *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003), where the plaintiff alleged that police officers <u>failed to preserve</u> and gather evidence that might have exonerated him, the Ninth Circuit imposed a bad faith requirement.  The Ninth Circuit has never explicitly discussed whether a similar bad faith requirement applies to a true *Brady* violation (i.e., a case dealing with the purposeful (bad faith) suppression of exculpatory evidence already in the possession of the government).

The Fourth Circuit, in *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000), extended the bad faith requirement to a civil *Brady* claim where an officer negligently failed to turn over exculpatory evidence in his possession.  *Jean's* reasoning is instructive.  The *Brady* disclosure obligation is derived from the due process protections afforded by the Fourteenth Amendment. The Fourth Circuit reasoned that some form of intentional conduct is required to impose liability for a due process violation under § 1983.

> [I]t would be impermissible to hold the police liable for due process violations under § 1983 where they have acted in good faith. In *Daniels v. Williams*, the Supreme Court stated "that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." 474 U.S. 327, 328 (1986). The Fourteenth Amendment mandates, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. *Daniels* holds that, as a matter of plain constitutional text, no "deprivation" occurs on account of official negligence. 474 U.S. at 330-33.  Indeed, negligent conduct cannot by definition establish the "affirmative

abuse of power" necessary to constitute a due process deprivation. See id. at 330-32. Under *Daniels*, then, police officer negligence or inadvertence in failing to turn over evidence cannot be actionable under § 1983.

The *Jean* court analogized the circumstances before it to *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), which concerned police officers who allegedly failed to preserve potentially exculpatory semen evidence.

The *Youngblood* Court held, however, that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58.

While *Youngblood* dealt with the failure to preserve evidence, its principles are certainly applicable to the present situation. Here, as in *Youngblood*, the prosecutor and ultimately the defense allegedly failed to receive exculpatory evidence from the police. Here, as in *Youngblood*, the police officers' actions were alleged to constitute a due process violation. The *Youngblood* Court stressed its "unwillingness" to read the Due Process Clause to impose "on the police an undifferentiated and absolute duty" in that context. *Id.*

We similarly decline to impose a sweeping duty on police in the instant situation and note the obvious drawbacks of doing so.  For instance, such a duty would widen the legal gulf between prosecutors and police to such an extent as to make scapegoats of police for every item of evidence discovered post-trial. Prosecutors plainly enjoy absolute immunity in the exercise of their prosecutorial duties, of which the disclosure of Brady material to the defense is clearly one. See *Kalina v. Fletcher*, 522 U.S. 118, 123-29 (1997); *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 413-16, 430-31 (1976). To confer on prosecutors absolute immunity while denying to police the right to argue even bona fides would multiply exponentially litigation against even conscientious officers.

*Id.* at 661 (parallel citations omitted).

Arguably, this case is distinguishable from *Jean* because

Brownlee is in fact a prosecutor, not a police officer.  There is a common characteristic of all the section 1983 *Brady* cases: the Defendants in such cases are always either investigators, *see Ramirez v. County of Los Angeles*, 397 F. Supp. 2d 1208, 1226-27 (C.D. Cal. 2005)(claim failed on other grounds), or prosecutors who were acting in their investigatory capacity, *see Houston*, 978 F.2d at 368 (claim survived absolute immunity challenge and was remanded for further proceedings).  This is because prosecutors acting in their quasi-judicial capacity are absolutely immune from civil liability.  *See Imbler*, 424 U.S. 409.  The remaining *Brady* allegation in this case concerns acts taken by Brownlee outside the scope of his role as a prosecutor.  Stripped of the protections afforded prosecutors, it is reasonable to apply to Brownlee the standard of law applicable to investigators.[16] Plaintiff must establish more than mere negligence on Brownlee's part.  See *Daniels*, 474 U.S. at 328 ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").

Here, it is undisputed that Brownlee turned the Poeschel Reports over to Leslie Greer, Plaintiff's trial counsel.  (Greer

---

[16]     The Ninth Circuit in *Devereaux* also cautions against the danger of allowing any Brady claim valid in the criminal context to translate into a civil liability claim: "a Brady violation cannot in itself support a deliberate-fabrication-of-evidence claim –- if it did any prisoner with a successful Brady claim would be able to bring a § 1983 action against the prosecutor for deliberate falsification of evidence."  263 F.3d at 1079.

Decl. at ¶6.)[17]   (It is also undisputed that he later turned the reports over to Defendant Marshall, the Assistant Attorney General assigned to handle the State's opposition Plaintiff's appeal and habeas petition.  But this disclosure did not occur until December 21, 2001.)  The inquiry turns to whether Brownlee's disclosure of the Poeschel reports to Greer satisfied his duty to disclose, or whether this act constituted an intentional (i.e., more than negligent) delay to deprive Plaintiff of his constitutional rights.

     Plaintiff argues that Brownlee was under a further duty to disclose the existence of the recantations directly to the court. Plaintiff, however, cites absolutely no authority for this proposition, nor has any been located.  To the contrary, some authority suggests a prosecutor's Brady obligation may be met in a variety of ways that fall far short of providing direct notice of the evidence to a court.  For example, a prosecutor may rely on an "open file policy" to comply with Brady, whereby defense counsel are permitted access to the prosecution's entire file. *Strickler v. Greene*, 527 U.S. 263 (1999).

     The undisputed circumstances surrounding the recantations suggest why it may have been more provident for Brownlee to leave the decision as to whether to disclose the reports up to defense counsel.  Around the same time that the witnesses began to recant, Plaintiff was sending letters to the families of at least

---

     [17]    The only relevant factual issue that remains in dispute is whether Wijsen actually received the Poeschel Reports from Greer.  This appears to implicate potential negligence on Greer's part, if she failed to timely provide the report to Wijsen.

some of the witnesses, offering them financial gain in exchange

for recantations.  Brownlee's November 21, 2000 letter to Greer[18]

discusses his belief that these letters cast doubt upon the

import of the recantations.[19]  (*See* Pltf's Ex. E.)  Nevertheless,

Brownlee provided the reports to Greer and left it up to her to

let him "know if [she] would like to do anything about this."

(*Id.*)

Plaintiff asserts that Brownlee also had an obligation to

disclose the reports directly to Wijsen, Plaintiff's appellate

counsel.  By the time Brownlee disclosed the Poeschel reports to

Greer on November 21, 2000, Wijsen was already actively involved

in the appeal, having filed his opening appellate brief on

September 25, 2000.  Although there is moral authority in

Plaintiff's argument, he has cited no legal authority that

---

[18]   That letter states:

Enclosed please find a number of reports from our
investigations unit, as well as multiple letters from
Faulkner to the parents of the victims.

It appears that the girls are recanting their story.
However, it also appears that Brandon is sticking to his
story.  You might recall that the jury convicted on Brandon,
acquitted on the girls.

While reading through the information, I noted that
about the time Faulkner starts offering money to the family
of the victim's [sic] is about the time the girls recanted
their story.  Interesting.

Let me know if you would like to do anything about
this.

[19]   This belief is supported by a long line of cases
holding that recantations should be viewed with suspicion.  *See*
*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997).

imposes a clear duty upon Brownlee to direct the information to appellate counsel nor has any been located.

There is no evidence in the record suggesting that Brownlee's disclosure of the Poechel reports to Greer was an unreasonable or intentionally deficient method of disclosure. The qualified immunity analysis need not proceed past the first step, as the facts to not establish a constitutional violation.[20] Brownlee is entitled to qualified immunity for his conduct in connection with causing the preparation of and disclosure to Faulkner's defense lawyer of the Poeschel reports.  Brownlee's motion for summary judgment on this remaining claim is **GRANTED**.

## G.   Motion to Reinstate Defendant Greer.

The current lawsuit, filed in July 2004, initially named Kern County Deputy Public Defender Lesley Greer as a defendant. In March 2005, Deputy County Counsel Andrew Thompson and Plaintiff's counsel, Ellen Ellison, discussed the possible voluntary dismissal of Lesley Greer and others.  Mr. Thompson represented that he knew of nothing that Ms. Greer had done that would impose liability upon her.  Shortly thereafter, the parties stipulated to the dismissal of Greer with prejudice.

Faulkner now asserts that the dismissal was based upon Mr. Thompson's misrepresentations as to Greer's involvement and/or complicity in a *Brady* violation.  Specifically, Faulkner asserts

---

[20]   Even if, arguendo, the record did establish a constitutional violation, the existence of a duty to disclose to someone other than Ms. Greer is far from the type of "clearly established" rule required to overcome qualified immunity.  Here, to the contrary, a reasonable official could believe that Brownlee's disclosure to Greer was adequate under the circumstances.

that there is evidence that Ms. Greer failed to pass the Poeschel

Reports on to Mr. Faulkner's appellate attorney.   Faulkner bases

his motion to reinstate on Federal Rule of Civil Procedure 60(b),

which provides:

> On motion and upon such terms as are just, the court
> may relieve a party or a party's legal representative
> from a final judgment, order, or proceeding for the
> following reasons: (1) mistake, inadvertence, surprise,
> or excusable neglect; (2) newly discovered evidence
> which by due diligence could not have been discovered
> in time to move for a new trial under Rule 59(b); (3)
> fraud (whether heretofore denominated intrinsic or
> extrinsic), misrepresentation, or other misconduct of
> an adverse party; (4) the judgment is void; (5) the
> judgment has been satisfied, released, or discharged,
> or a prior judgment upon which it is based has been
> reversed or otherwise vacated, or it is no longer
> equitable that the judgment should have prospective
> application; or (6) any other reason justifying relief
> from the operation of the judgment. The motion shall be
> made within a reasonable time, and for reasons (1),
> (2), and (3) not more than one year after the judgment,
> order, or proceeding was entered or taken. A motion
> under this subdivision (b) does not affect the finality
> of a judgment or suspend its operation...

Plaintiff specifically invokes Rule 60(b)(3) and (b)(6), which

allow for a judgment to be set aside because of "fraud,

misrepresentation, or other misconduct of an adverse party," and

for "any other reason justifying relief from the operation of the

judgment," respectively.

Reinstating Greer as a defendant also implicates Federal

Rule of Civil Procedure 15, which provides

> A party may amend the party's pleading once as a matter
> of course at any time before a responsive pleading is
> served or, if the pleading is one to which no
> responsive pleading is permitted and the action has not
> been placed upon the trial calendar, the party may so
> amend it at any time within 20 days after it is served.
> Otherwise a party may amend the party's pleading only
> by leave of court or by written consent of the adverse
> party; and leave shall be freely given when justice so
> requires....

**75**

Leave to amend should be "freely given," "[i]n the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, substantial time has passed, discovery is closed, and the case has been pursued without Greer's participation.  Even if Plaintiff satisfied the requirements for setting aside the dismissal with prejudice under Rule 60, amendment to add Greer as a defendant would be legally futile.

It is undisputed that Brownlee forwarded the Poeschel reports to Greer on November 21, 2000 and that Greer received them.  Greer admits as much and Plaintiff does not dispute this. (Greer Decl. at ¶6.)  Upon receipt of the reports, Greer asserts that she telephoned Wijsen immediately and informed him of the contents of the reports.  (*Id.*)  Greer maintains that she then forwarded copies of the reports to Wijsen.  Faulkner contends that Ms. Greer never forwarded the reports to Wijsen, a contention that is supported by some circumstantial evidence. For example, although the habeas petition filed by Wijsen on behalf of Mr. Faulkner on June 19, 2001 does indicate that Wijsen received information in September 2000 that several of the child witnesses intended to recant their testimony, Wijsen makes no reference to the Poeschel reports therein:

//

//

In September 2000, appellate counsel for petitioner received information alleging that Mary Blankenship, the mother of two key prosecutorial witnesses in the case agaoist petitioner, Samantha Spoon and Breanna Blankenship, had contacted the Kern County District Attorney's staff and advised it that her children had lied at trial about what had occurred between them and petitioner.  Next[,] appellate counsel had it confirmed by Bakersfield Attorney James L. Faulkner [] that the two children had admitted to Mary Blankenship that their accusations against petitioner were a total fabrication and that the alleged attempted abduction and false imprisonment of Brandon McElroy was in fact nothing more than petitioner stopping Brandon and others from throwing rocks at him.

(Doc. 49, County's Opp'n to Mot. to Reinstate, Ex. 1 at 6.)

Instead, the petition relies exclusively upon Smith's interviews of Brianna Blankenship and Samantha Spoon, in which both girls recant their trial testimony.  For purposes of this motion, therefore, it is be assumed that Greer indeed did fail to turn the Poeschel reports over to Wijsen.

There is not an iota of evidence that Greer's failure was more than negligence.  Such a failure does not expose Greer to civil liability under section 1983.[21]  At best, Plaintiff could maintain a professional malpractice suit against Greer, provided all of the prerequisites to such a suit were satisfied.  But, given that all of the federal claims in this lawsuit have been

---

[21]    Plaintiff speculates that Greer may have conspired with Brownlee and/or others to violate Plaintiff's civil rights.  In theory, such a claim could render a non-state actor, such as Ms. Greer, liable under section 1983.  Here, however, Plaintiff offers nothing but conclusory allegations of conspiracy, asserting generally that Greer "joined in an effort to revise the facts regarding who was told of the Poeschel reports..." and that she "is apparently strongly motivat[ed] to aid Mr. Brownlee in an attempt to have met his duty under Brady... through her."   (See Doc. 91, Reply to Mot. to Reinstate, at 4-5.)   Apart from these conclusory allegations, however, Plaintiff offers absolutely no evidence of the existence of any such conspiracy.

resolved on summary judgment in favor of the Defendants, the
exercise of supplemental jurisdiction over this remaining claim
would likely be inappropriate.  *See* 28 U.S.C. § 1367(c)(3)("The
district courts may decline to exercise supplemental jurisdiction
over a claim...if...the district court has dismissed all claims
over which it has original jurisdiction....").

**H.  Plaintiff's Argument that the California 5th Appellate District Opinion Precludes Further Litigation on the Issue of Materiality under *Brady*.**

As discussed, Plaintiff's second state petition for a writ
of habeas corpus was successful.  In reaching the conclusion that
the writ should be granted, the Fifth Appellate District used the
term "material" in reference to the recanted evidence.  Plaintiff
now requests recognition of this ruling as collateral estoppel,
and argues that the Defendants should be barred from relitigating
the question of materiality for purposes of the Brady standard.
Because no *Brady* claim survives summary judgment, this argument
is moot.

**VI.  CONCLUSION**

For the reasons set forth above:

(1)  Defendants' motions for summary judgment are **GRANTED** as to all defendants on all claims;

(2)  Plaintiff's motion for summary judgment is **DENIED.**

(3)  Plaintiff's motion to reinstate dismissed defendant Greer is **DENIED.**

(4)  Defendants' motions to bifurcate are **DENIED AS MOOT.**

1

2

**SO ORDERED**

3

4

Dated: June 28, 2006

5
                                        __/s/ Oliver W. Wanger__
6
                                        OLIVER W. WANGER
7
                                  United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28